Filed 4/30/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S097414 |
| v. | ) | |
| | ) | |
| KIM RAYMOND KOPATZ, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. RIF086350 |
| _____ | ) | |

A jury convicted defendant Kim Raymond Kopatz of the first degree murders of Mary Kopatz and Carley Kopatz. (Pen. Code, § 187.)[1] It found true the special circumstance allegations of murder for financial gain (§ 190.2, subd. (a)(1)) and multiple murder (§ 190.2, subd. (a)(3)). After a penalty trial, the jury returned a verdict of death, and the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## I.  FACTS

### A.  Guilt Phase

#### 1.  The Prosecution's Case

##### a.  Introduction

On the afternoon of April 22, 1999, the strangled bodies of defendant's wife Mary Kopatz and his young daughter Carley Kopatz were discovered in the family's van, which was parked about one mile from the Kopatzes' home.  The prosecution presented circumstantial evidence of defendant's guilt.  The evidence reflected a financial motive.  Defendant had recently lost a large amount of money, was in debt, and was the beneficiary of life insurance policies on Mary and Carley; he also had made a claim on an insurance policy for Mary's wedding and anniversary rings four days after the murders.  The evidence further showed that although several people attempted to telephone defendant when Mary failed to show up for work that day, no one could contact him during the morning hours that Mary and Carley were initially missing.  Witnesses saw defendant or the family's van that morning in the area where the van — containing Mary's and Carley's bodies — was later found.  The crime scene inside the van had been staged to make it appear as if a robbery and sexual assault had occurred.  The prosecution also presented defendant's statements and behavior indicating consciousness of guilt and physical evidence linking defendant to the murders.

##### b.  Defendant's Finances

In April 1999, defendant and Mary had been married for 10 years.  They lived in a house on Garfield Street in Riverside with their two daughters, eight-year-old Ashley and three-year-old Carley.  Mary was manager of a Jenny Craig weight loss center in Riverside.  Defendant, who had been disabled in a workplace accident, was a stay-at-home father.  Defendant had 13 credit card accounts with a

2

total debt of $117,883 and had reached his maximum credit limit on those accounts. Although the family's monthly income was $4,259, their monthly expenses, including minimum credit card payments, were $8,620.

Tax records showed a loss of $71,955 during 1998. In 1998, a Charles Schwab brokerage account that defendant used for day trading contained over $20,000. By April 1999, the account's balance had fallen to $335. In 1998, an account with Irvine Trading Company that defendant used to trade commodities and futures contained over $46,000. By April 1999, the account's balance had fallen to $125.

The Kopatz family had nine insurance policies covering various family members. In the event of the deaths of Mary and Carley, defendant stood to gain more than $800,000 as beneficiary. Defendant also had an insurance policy that provided $13,628 in coverage for the loss of Mary's wedding and anniversary rings.

### c. Morning Hours When Mary and Carley Kopatz Were Initially Missing and Defendant Could Not Be Reached

Every morning from December 1998 to April 21, 1999, defendant and his younger daughter Carley took Ashley to school at 8:00 a.m. However, on the morning of April 22, 1999, defendant took Ashley to school at the usual time, but Carley did not accompany him.

David Laird worked near the Kopatzes' home on Garfield Street and frequently drove past it. He often saw defendant working in his yard with a van parked in the driveway. At 8:55 a.m. on April 22, Laird drove by on his way to work, but did not see defendant. Laird also noticed that the family's van was gone, but that a Chrysler sedan was parked in the driveway. Mary Kopatz usually drove the Chrysler.

3

When Mary failed to show up at work at her scheduled time of 11:00 a.m., Mary's coworkers at Jenny Craig became concerned, since she was always punctual. Mary's coworker, Mary Burdick, called the Kopatzes' residence at 11:00 a.m., but there was no answer. Burdick and another coworker called the house every 15 minutes between 11:00 a.m. and 12:15 p.m., but there was no answer.

Linda Lee, the secretary at Ashley Kopatz's school, called the Kopatzes' residence several times around 11:30 a.m., to obtain permission to give Ashley, a diabetic, an insulin injection. There was no answer. Ashley periodically checked her own blood-sugar levels while in class. She typically had high blood-sugar levels two or three times a week. When that occurred, the school principal, Patricia VanDyke, would call defendant or Mary Kopatz.

VanDyke returned to her office at noon. Around 12:05 p.m., after Lee informed her of Ashley's high blood-sugar level, VanDyke called the Kopatzes' house. There was no answer. She then called Mary Kopatz's work number, and was told that Mary had not arrived at work and that her coworkers were concerned. VanDyke then called defendant's cell phone, but there was no answer. Never before had VanDyke had occasion to call defendant's cell phone. She often needed to contact defendant, and had nearly always been able to reach him at home. On the rare occasion when defendant could not be reached, VanDyke had successfully contacted Mary at work.

VanDyke gave Ashley the insulin shot. At 12:30 p.m., she called Mary's work again, but was told that they had not heard from Mary. VanDyke called the Kopatzes' home and defendant's cell phone again, but there was no response. She called his pager and left the school's telephone number.

About 12:30 p.m., Mary's coworker, Mary Burdick, drove by the Kopatzes' house, but did not see defendant. She saw Mary's car parked in the driveway, but

4

did not see the family's van.  Burdick drove home and called the Kopatzes' home several more times, but received no answer.

### d. Discovery of Mary Kopatz's and Carley Kopatz's Bodies; Defendant's Conduct Before and After the Discovery

About 1:00 p.m. on April 22, David Laird drove by the Kopatzes' house again and saw defendant working on a sprinkler near the front driveway.  Maria Montoya, defendant's neighbor, also saw defendant working in the front yard between 12:00 p.m. and 1:00 p.m.

At 1:15 p.m., Mary Burdick called the Riverside police to report Mary Kopatz missing, but the police would not take a missing person report from her.

About 1:15 p.m., defendant called Jenny Craig and spoke to Jean Black. Defendant calmly asked if his wife had brought Carley to work with her.  Black reported that Mary had still not arrived.  Defendant explained that Mary was going to run some errands and pick up prescriptions at Sav-on and Walmart.  He mentioned that Mary's cell phone and pager were on the counter at home, but Jean knew that Mary took her cell phone "everywhere she went," in case Ashley needed insulin.  Defendant said he had been outside "digging all day," had lost track of time, and had come inside to get a drink of water.  During the conversation, defendant knocked over a glass of water, exclaimed, "Oh shit," and began to act "rattled" and "panicked."

At 1:30 or 1:40 p.m., Mary Burdick called defendant again and defendant answered.  Burdick said that she was worried because Mary still had not shown up at work and Ashley's school had called about her injection.  Sounding upset, defendant said that he had spoken to Jean Black and was aware of the situation. Burdick told him she had gone to the house and assumed they were out since the van was not there.  She asked defendant where he had been all morning.  He replied that he had been in the backyard working all day and that Burdick should

5

have gone there to talk to him.[2]  Defendant stated that Mary and Carley had left the house between 8:30 and 9:00 a.m. to run errands; he thought Mary had taken Carley to work for "take your daughter to work day."  However, Burdick knew that two weeks earlier, Mary Kopatz had advised the staff at a meeting not to bring their children to work for liability reasons.  Mary had also mentioned that Carley was too young to come to work.  Burdick was still concerned about Mary.  She spoke to her husband Doug Burdick and he agreed to go over to the Kopatzes' house.

At 2:00 p.m., defendant called Principal VanDyke.  Sounding "frantic" and "highly upset," defendant declared that Mary was missing and he could not find her.  VanDyke told him the school had been trying to contact him and asked where Carley was.  Defendant responded that Carley was with Mary; he did not hear his cell phone because he had been in the backyard and it had been on the kitchen sink.  He told VanDyke that Mary's purse was on the kitchen sink and that she had only taken her wallet.  While they were talking, defendant informed VanDyke that Doug Burdick had just pulled up to the house; she asked to speak with Burdick.  VanDyke asked Burdick to look after defendant, while she took care of Ashley.

Doug Burdick arrived at the Kopatzes' house between 2:10 and 2:15 p.m.  Burdick asked defendant what he had been doing all day.  Defendant responded that he had been digging and installing sprinkler pipe in the backyard.  It did not appear to Burdick that defendant had been digging, however.  Defendant was not sweaty and was dressed all in white.  There was no dirt on his pants, shirt, or

---

[2]  The prosecution presented impeachment evidence that on April 22, defendant dropped off some clothing at the dry cleaners between 11:30 a.m. and 12:00 p.m.

6

hands. However, there was "blue paint" on the tops of defendant's hands and on his forearms.[3]

When Doug Burdick asked if anyone had heard from Mary, defendant began shaking and crying. He declared that something was wrong and they could not find Mary. Burdick assured defendant that Mary might be running late or possibly had a flat tire. Defendant related that Mary was supposed to fill a prescription at Sav-on and then go to Walmart. Burdick saw Mary's purse next to the kitchen sink and a set of keys, a cell phone, and a pager on a shelf near the front door. When Burdick asked why Mary's purse was still there, defendant explained that Mary only took her wallet and left her purse at home.

When Doug Burdick asked if he had called the police, defendant said no. Burdick told defendant that his wife had attempted to file a police report, but the police "would not take it." He recommended that defendant call the police. Becoming agitated and angry, defendant declared it was a "fucking pain in the ass" and said he did not want to call the police. He exhibited strange behavior, repeatedly spitting in the sink, exclaiming it was a "fucking pain in the ass," and intermittently folding clothing. He complained that the police would not care and would place his call on hold.

---

**3** Other witnesses also saw what they described as blue "PVC glue" on defendant's hands, wrists, and elbows. It was the prosecution's theory that defendant was trying to hide scratches and cuts on the areas covered by the glue. Doug Burdick testified that he saw a wagon containing PVC pipes in the driveway, but that the PVC pipes were still tied together in a bundle and did not appear to have been used. On the other hand, defendant's brother, Alan Kopatz, testified that when he went to the Kopatzes' house on the afternoon of April 22, he saw PVC pipes and tools spread over the driveway. It appeared to Alan that work had been done in the front yard; freshly cut PVC pipes had been laid in two holes dug there.

Around 3:15 p.m., Doug Burdick finally convinced defendant to call the police. At one point, defendant was placed on hold and became very upset. He hit the kitchen cabinet with his fist, and exclaimed, "Ah fuck. Here we go again." During the conversation with police, defendant reported that his wife and daughter were missing and that his wife had failed to show up for work at 11:00 a.m. Contrary to his statement to Mary Burdick, defendant claimed that he last saw his wife at 7:30 a.m., before he took Ashley to school. He also told the police that he did not think his wife was going to take his daughter to work with her, that he expected her to return home after running errands and before going to work, and that he had called hospitals and had been doing yardwork.

At the Kopatzes' house, Burdick saw two rings next to the bathroom sink. At trial, he described the rings as having "a similar cut" to Mary's wedding ring and as being "very, very similar" to Mary's anniversary band.

Defendant's brother, Alan Kopatz, arrived at the Kopatzes' house about 3:20 p.m., after learning that Mary was missing. Alan asked what Mary had been doing that morning. Defendant responded that she was going to Sav-on to pick up a prescription and then run a few errands. He stated that he had called Sav-on to see if Mary had been there, but was told that she had not picked up the prescription.[4] He stated that he had called the police and hospital emergency rooms.

Alan Kopatz announced that he was going to Sav-on to search for the family's van. He grabbed defendant's keys, in case he found the van. Defendant

---

[4] Several Sav-on employees testified that they worked on the morning of April 22, 1999, but did not recall defendant calling to ask whether his wife picked up a prescription. One employee testified that such a phone call would have been unusual, since defendant was the one who usually picked up prescriptions from the store.

became very agitated and ordered Alan not to take "the whole fucking set of keys." Defendant removed the van key from the keychain and gave the key to Alan. Alan drove through the Sav-on parking lot, but did not see the van.

Alan drove to a nearby Walmart where Mary shopped. While driving, he saw the family's van parked on Duncan Avenue, about one mile from the Kopatzes' house. He stopped and tried to look inside the van, but his vision was obscured by the tinting on the windows. He could not open the door. He asked the resident of a nearby house, John Lopez, if he could use Lopez's phone for a possible "emergency." Alan called the Kopatzes' house and defendant answered the phone. When Alan related that he had found the van, defendant let out a deep sigh and exclaimed, "Oh, my God." Alan asked to speak to Mary's father, who had arrived at the house earlier, and gave him directions to the van.

Alan walked back to the van and looked inside again. This time, he placed his hands on the window to help him see into the van. He saw Mary's body on the floor, ran back to Lopez's house, and called 911. While still on the phone with the 911 operator, Alan returned to the van and saw Carley's facedown body.

Riverside firefighters arrived at the scene and found Mary Kopatz's body on the floor of the van and Carley Kopatz's body near the rear seats. Carley's body lay facedown. There was a large pool of blood under her face and her arms and shirt were bloodied. Mary's body lay faceup. Mary's belt was unbuckled. Her pants were unbuttoned, unzipped, and spread open, exposing her underwear. Her bra was "protruding" from under her shirt. Her shoes were not on her feet, but were in the van. There were no rings on her fingers.

On the van's floorboard, the police found two torn-up blank checks from the Kopatzes' checking account. They also found Mary's wallet containing a $20 bill, credit cards, her driver's license and Social Security card, and store receipts. There were more cards and receipts strewn on the floorboard. None of the receipts

9

were dated that day, April 22, 1999. The driver's seat was at its farthest position back.[5]

Alan Kopatz called the Kopatzes' house and spoke to his mother, who by then was also at the house. He told her that Mary and Carley were dead. When she told this to defendant, he exclaimed, "Oh my God. Not my baby too," and began hitting his head against a cupboard.

At 6:00 p.m., Officer Patrick McCarthy arrived at the Kopatzes' house. Paramedics were already there, examining defendant in response to his complaints of back pain. After their examination, the paramedics announced that defendant was fine and left the house around 6:30 p.m.

About 6:30 p.m., Sergeant Patrick Watters arrived at the Kopatzes' house. He spoke with defendant's father, who related that defendant said he had taken his older daughter to school at 8:00 a.m. and that Mary was going to take Carley to work with her.

At 6:43 p.m., police evidence technician Carlton Fuller arrived at the Kopatzes' house and conducted a gunshot residue test on defendant's hands. Fuller saw red marks on defendant's eyelid and wrist, scratches on his forehead and hands, cuts on his hands, bruises around his elbows, and "blue glue" on his hands. When Fuller took swabs from his hands and took photographs, defendant leaned away and became uncooperative. Defendant's hands shook as Fuller photographed them. When Fuller asked defendant questions, he did not answer.

---

[5]     The prosecution's theory was that because defendant was taller and weighed more than Mary, the driver's seat was positioned for defendant, not for Mary. Defendant is 5 feet 10 inches tall and weighed 165 pounds. Mary was 5 feet 6 inches tall and weighed 134 pounds when she died.

10

Throughout the evening at the Kopatzes' house, Officer McCarthy and Sergeant Watters heard defendant repeatedly complain of severe back and head pain; they did not hear him ask questions about the progress of the investigation relating to his wife or daughter.[6] Sometime after 8:00 p.m., the paramedics returned to the house in response to defendant's demands to be seen again. Between 8:00 and 9:00 p.m., the paramedics took defendant to the hospital. Officer McCarthy also went to the hospital.

At 9:00 p.m., senior evidence technician Tim Ellis arrived at the hospital to photograph defendant. The left side of defendant's face was red. He had scratches on his left arm and right hand. Blue glue covered his left and right hands. While being photographed, defendant shook "rather badly" and "moaned and groaned a lot."

Officer McCarthy remained at the hospital while defendant was there. At the hospital, defendant never asked about the murder investigation, but only complained of back pain. Shortly before midnight, the emergency room staff gave defendant pain medication and discharged him. Officers McCarthy and Donald Goodner walked with defendant to the patrol car and drove him to the detective bureau. While in the patrol car, defendant continued to complain about head and neck pain, but asked no questions about the investigation or about his wife or daughter. On their arrival at the detective bureau, defendant complained that his pain was becoming more severe.

---

[6]     Doug Burdick testified that while he was at the Kopatzes' house, defendant never complained of back pain.

11

## e. Defendant's Interview with Police

Detectives Steven Shumway and Gary DeVinna interviewed defendant at 1:00 a.m. on April 23. Defendant related that he took Ashley to school and returned home between 8:30 and 9:00 a.m. to find Mary and Carley getting ready to leave the house. At 9:00 a.m., Mary left with Carley to run errands,[7] which included picking up a prescription at Sav-on. Mary intended to come home before she left for work at 11:00 a.m. After they left, defendant installed pipes for sprinklers in the front yard and cleaned around the pool in the backyard. He did not hear the calls from Mary's work because the phone was in the house and he was outside. When the detective commented that his fingernails were "pretty clean" for having worked in the dirt, defendant replied that he had been washing his hands. When asked about the "fresh injuries" on his wrists, defendant claimed that he received them six months earlier from pulling out the roots of the trees in his yard. He also claimed he hit his head that afternoon on a brick planter while digging and installing pipes.

Between 1:00 and 1:30 p.m., defendant realized Mary was missing and called the police and several hospitals. He also called Sav-on to determine if she had picked up a prescription. The police had told him to call the hospitals. When he did, no one was there. He denied any knowledge of the killing of Mary and Carley.

Shortly before 2:00 a.m., the interview concluded and Officers McCarthy and Goodner drove defendant to his brother's house. During the drive, he continued to complain about his pain.

---

[7]     Although defendant's statement to the detectives was consistent with what he had told Mary Burdick, his statement to the 911 dispatcher was different. He told the dispatcher he last saw Mary and Carley at 7:30 a.m., before he took Ashley to school.

*f. Defendant's Behavior After the Murders*

On April 24, two days after the murders, defendant and his daughter Ashley went to Mary's parents' house. Defendant asked Robert Foley, Mary's brother, if he could park his car towards the back of the house. Defendant believed that the police had followed him as he drove there and that they had bugged his car. He told Mary's father and brother that there had been a lot of police around his house, warned them not to talk to the police, and gave them the business card of an attorney. Defendant instructed that if the police contacted them, they should not talk to the police, but instead refer them to the attorney.[8]

Robert Foley and his sister, Janet Foley, saw scratches on defendant's hands, forearms, forehead, and face, and a bump on his forehead. There was no longer any blue PVC glue on defendant's hands. Defendant explained that while working in his backyard, he bumped his head on a brick and scratched his hand while digging and installing pipes.

On the morning of April 26, defendant called Mary Burdick and asked if she went to his house at 11:00 or 11:30 on the morning of the murders. Mary replied that she went to his house at 12:30 p.m., after his wife failed to come to work. Defendant explained that he "must have been out to lunch or eating lunch" when she came by.

The insurance policy, which covered Mary's wedding and anniversary rings, was due to expire on April 26, four days after the murders. On that same date, defendant made a claim for $13,628 under the policy. When the claims specialist called defendant the next day, defendant claimed that his wife had been

---

[8] The business card contained information for one of the attorneys who later represented defendant at trial.

wearing her rings when she was murdered, but that the rings were missing when her body was found in the van.

The police found a printed list of stocks, stock quotes, and dates next to defendant's computer. The printout showed that defendant had played an online fantasy stock game on various dates, including the days before and after the murders.

g. *Defendant's and the Van's Whereabouts on the Morning of the Murders*

The police interviewed various witnesses who lived near the Duncan Avenue location where the van and bodies had been discovered. John Lopez lived on Duncan Avenue, about one mile from the Kopatzes' house. Lopez saw the van parked two houses from his house during the morning of April 22. The van was still there when he returned from a medical appointment at 11:00 a.m.[9] Lopez's wife confirmed that she also saw the van around 11:30 a.m.

Two witnesses who lived on Nellie Street, which runs perpendicular to Duncan Avenue, also saw the van drive past their house sometime before noon.

Edward "Les" Ballou lived on Nellie Street, around the corner from Duncan Avenue. On April 22, between 10:00 a.m. and 10:30 a.m., Ballou was in his front yard and saw defendant walk by. Ballou said "hi." Defendant responded " 'hello,' " but appeared to be "dour" and angry.[10]

---

[9] On April 23, Lopez told the police that he first saw the van around 8:40 a.m., but a few days later, he said to them he was not sure he had seen the van that early. However, he was positive he saw the van at 11:00 a.m.

[10] Ballou died before trial. Ballou's testimony was presented through his preliminary hearing transcript.

14

*h. The Autopsy Findings*

Both Mary and Carley Kopatz died from asphyxia due to ligature compression of the neck. The ligature marks indicated that Mary and Carley had been strangled from behind with a smooth cord, such as a nylon rope or electrical cord. There were two ligature marks across Mary's neck, indicating that she had been moving and struggling while being strangled. There was only one ligature mark across Carley's neck, indicating that Carley had not been moving or struggling while being strangled.

Mary had also suffered two broken ribs on her right side, which was not a fatal injury, but likely a cause of significant pain. The broken ribs could have been caused by a knee placed forcefully against her ribcage as she lay on the ground.

In addition, Mary had suffered blunt force trauma to her face and the back of her head. She had bruising and discoloration on the left side of her face and behind her left ear, a blackened right eye, and bleeding inside her scalp. There was a streak of blood that went from Mary's right ear to her cheek and stopped near her nose. This suggested that Mary's body had been moved; the body had been facedown at some point, contrary to the faceup position in which she was found in the van. There were contusions on her left elbow, left shoulder, left wrist, and the back of both hands and knees. A few of Mary's fingernails were broken, but it could not be determined whether they were "freshly broken." There was a small amount of tissue, which appeared to be skin, adhering to one of her fingernails. There were no injuries consistent with sexual assault.

Carley suffered a slashing wound to the skin of her neck. It was likely inflicted postmortem by a sharp instrument with a cutting edge. The wound exposed, but did not damage, her larynx and thyroid. There were superficial slashing wounds to Carley's right arm, but no other bruises or injuries.

15

### i. Forensic Test Results

Suspecting that the murders had not occurred in the van, the police collected a portion of carpet and of a hallway doorframe from the Kopatzes' house, which tested positive for blood. Criminalist Daniel Gregonis determined that the DNA profile from the blood on the doorframe was an exact match to Mary's profile, providing "strong evidence" that Mary was a "good potential" source of the blood.[11] Gregonis could not obtain a DNA profile from the blood on the carpet. He stated that a possible explanation for the inability to obtain a profile was the presence of an inhibitor, such as a cleaning solution, that had been applied to the stain. Criminalist Michele Merritt noted a stain on the back of the carpet, but could not determine if it was from cleaning fluid. She opined that if any liquid had been applied to the bloodstain, it was after the blood had dried completely.

Fibers found on Mary's front torso, left sock, and lower left leg were consistent with fibers from the carpet in the Kopatzes' house.

DNA testing eliminated Mary and Carley as contributors to the scrapings found under Mary's fingernails, but could not eliminate defendant as a possible contributor.

### 2. The Defense's Case

Mary Rolle lived across the street from the Kopatzes' house. About 9:00 a.m. on the day of the murder, she spoke to defendant in front of her house. There was nothing unusual about his demeanor.[12]

---

[11] Gregonis testified that the blood from the hallway doorframe could be expected to be found in about 1 in 4.2 million Caucasians, 1 in 7.6 million Hispanics, and 1 in 95 million African-Americans.

[12] The defense presented Rolle's testimony to impeach Lopez's testimony that he saw defendant's van near his Duncan Avenue house at 8:30 or 8:45 a.m. the morning of the murders.

Arthur Kopatz, defendant's brother, testified that after receiving a past due notice on one of defendant's insurance policies, he signed defendant's name on the notice and wrote, "Mary was murdered 4-22-99. Death cert not released as of 7-06-99." Arthur stated that he did this to cancel the deductions taken from defendant's checking account, and not to make a claim on the policy for defendant.

Doug Burdick was first interviewed the day after the murders. At trial, he testified that he could not recall if he had told the police he had seen rings in the Kopatzes' bathroom. However, before his trial testimony, Burdick asked a police detective if the rings were ever located.

### B. Penalty Phase

#### 1. The Prosecution's Case

The prosecution presented victim impact evidence from Mary and Carley's family members.

#### 2. The Defense's Case

Defendant presented testimony from his family and neighbors. They portrayed defendant as being quiet, dependable, and close to his children and siblings, and as having an even-keeled temperament and a good marriage. They testified that defendant had had an accident at work; afterwards, he went on disability, suffered headaches, and stuttered.

#### 3. Prosecution Rebuttal Evidence

Mary's coworker, Jean Black, testified that about nine months before the murders, she attended a party at the Kopatzes' house. Before the party, Mary warned Black that defendant behaved unpredictably, that he sometimes had angry outbursts and used obscenities. She attributed this behavior to his workplace injury. Mary confided that she was unhappy in her relationship with defendant,

17

describing it as "not a close loving" one.  At the party, Black saw one of
defendant's angry outbursts, during which he cursed at his guests.

Several weeks before the murders, Black ran into Mary and her daughter,
Ashley, at the shopping mall.  When Ashley asked Mary if they were going home,
Mary replied, "You saw how mad your father was, we can't go home yet."

## II.  DISCUSSION

### A.  Guilt Phase Issues

#### 1. *Suppression Motion*

At trial, defendant moved to suppress evidence of his videotaped interview
with the police on the ground that he was unlawfully seized under the Fourth
Amendment when taken to the detective bureau and subjected to custodial
interrogation without being given *Miranda* warnings (*Miranda v. Arizona* (1966)
384 U.S. 436).  The trial court denied the motion.  It found that because defendant
was not in custody, *Miranda* warnings were not required.  Consequently, the
prosecution played for the jury the videotape of defendant's interview during its
case-in-chief.  On appeal, defendant contends that the trial court erred in denying
his suppression motion.  We find no error.  We conclude that defendant was not
seized when taken to the detective bureau and not in custody when questioned by
the detectives.

##### a.  *Underlying Facts*

Towards the end of the prosecution's case-in-chief, the prosecution re-
called Detective Shumway to present evidence of defendant's interview with the
police.  At that point, defense counsel moved to suppress evidence of the
interview.  Counsel argued that he had believed defendant voluntarily
accompanied the officers to the detective bureau until Officer McCarthy
completed his trial testimony.

18

During his cross-examination, Officer McCarthy stated that the investigating detectives directed him to transport defendant to the detective bureau. When they were leaving the hospital, Officer McCarthy told defendant they were taking him to the detective bureau, but could not recall if he asked defendant for his permission. Defendant did not object to going to the detective bureau, was not handcuffed, and was not under arrest.

Based on this testimony, defense counsel argued that because the officers did not ask defendant for permission to take him to the detective bureau, the interview was the product of an "illegal transport/detention."

Officer Goodner and Detective Shumway testified at the suppression hearing. Officer Goodner stated that he was at the Kopatzes' house for about 45 minutes. During that time, defendant moved freely around the house and the officers did not restrict his movements. After defendant asked the paramedics to take him to the hospital, a police sergeant directed Officer Goodner to go to the hospital and then transport defendant to the detective bureau. At the hospital, Officer Goodner told defendant he was being taken to the detective bureau because "they would like to talk to him there." Defendant responded, "Fine."

Defendant walked out of the hospital to the police car on his own accord. The officers did not handcuff him, place him under arrest, or restrict his movements. They did not frisk or search defendant before he entered the police car. During the 10-minute ride to the detective bureau, defendant did not make any complaints. Officer Goodner escorted defendant to the detectives inside the station and waited until the interview was over. He then drove defendant to his brother's house. Defendant never told Officer Goodner he wanted to leave.

Detective Shumway testified that about 1:00 a.m. on April 23, 1999, he and Detective DeVinna interviewed defendant in an unlocked interview room. They knew defendant had reported to the police that his wife and daughter were missing

19

and wanted him to describe Mary's and Carley's activities on the day of the murders. They did not consider him to be a suspect, but a witness who was free to leave any time he wished. Defendant was not handcuffed and his movements were not restricted. The interview began almost immediately after defendant's arrival. The detectives told defendant they were going to ask some questions and he could then leave. Defendant did not object to the interview.

During the interview, the detectives asked when defendant last saw his wife and daughter and what he had been doing that day. At one point, they gave defendant some water. At another point, defendant asked to go to the bathroom. As per policy, Detective Shumway escorted defendant there and waited to walk him back to the interview room. Towards the end of the interview, defendant asked how much longer it would take. The detectives replied that he could go home after they asked him a few more questions. The interview lasted less than an hour and never became accusatory.

Detective Shumway testified that if defendant had not wanted to go with the officers to the detective bureau, the detectives would have gone to the hospital to talk with him there. He stated that because nobody was at the detective bureau to take defendant home, he asked Officers Goodner and McCarthy to transport him.

The detectives also interviewed defendant's daughter, Ashley, at the detective bureau at another time. Detective Shumway stated that it is "extremely critical" to a homicide investigation to obtain statements within 72 hours from people who had the last contact with the victims.

After reviewing the videotape of defendant's interview and the transcript of the trial testimony relating to the interview, the trial court denied defendant's suppression motion. The court reasoned that under the totality of the circumstances, a reasonable person in defendant's position would not have

20

believed he was in custody, and thus, *Miranda* warnings were unnecessary. Defendant renews his claim that: (1) he was unlawfully seized under the Fourth Amendment when taken to the detective bureau and (2) subjected to custodial interrogation without being given Miranda warnings at the detective bureau in violation of his Fifth Amendment rights.

As to the Fourth Amendment claim,"[i]n ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority" ' terminates or restrains his freedom of movement, [citations], '*through means intentionally applied*,' [citation]." (*Brendlin v. California* (2007) 551 U.S. 249, 254.) "When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence," the test for determining if a seizure occurred is whether, " 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' [citation]." (*Id*. at p. 255.) The coercive effect of the encounter can be measured by whether " 'a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter,' [citation]." (*Ibid.*)

As to the *Miranda* claim, " '[b]efore being subjected to "custodial interrogation," a suspect "must be warned he has a right to remain silent, that any

21

statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1399-1400.) Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "When reviewing a trial court's determination that a defendant did not undergo custodial interrogation," an appellate court accepts the trial court's findings of historical fact if supported by substantial evidence, but independently determines "whether, given those circumstances," the interrogation was custodial. (*People v. Leonard, supra*, 40 Cal.4th at p. 1400.)

An interrogation is custodial when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona, supra*, 384 U.S. at p. 444.) The test for *Miranda* custody is, " 'would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) The objective circumstances of the interrogation are examined, not the " 'subjective views harbored by either the interrogating officers or the person being questioned.' " (*Ibid.*)

Thus, as relevant here, the test for determining whether a person was seized under the Fourth Amendment or was under *Miranda* custody is essentially the same: whether a reasonable person would have felt he or she was at liberty to leave or to decline the officers' requests to go to the detective bureau and be interviewed there.

Here, defendant's encounter with Officers Goodner and McCarthy between the hospital and the detective bureau was consensual. (*People v. Terrell* (1999) 69 Cal.App.4th 1246, 1253.) When Officer Goodner told defendant he was being taken to the detective bureau because "they would like to talk to him there,"

22

defendant indicated assent by responding, "Fine."  The officers did not handcuff defendant or display any weapons.  Defendant walked unassisted to the patrol car.  The officers did not frisk or search defendant before he entered the patrol car.  (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 [circumstances establishing seizure include presence of several officers, officer's display of weapon, some physical touching of the person, or use of language or tone of voice indicating compliance with officer's request might be compelled].)  The drive to the station was only 10 minutes, and defendant did not voice any complaints or opposition.

Defendant claims that his response, "Fine," was an acquiescence to the officers' show of authority, especially since they did not say he was free to go and he had just spent several hours in the emergency room, had no other means of transportation, and was dressed in shorts and a T-shirt.  Defendant further argues that he was transported in a locked cage in the back of the patrol car and relies on *Kaupp v. Texas* (2003) 538 U.S. 626, 629.  In that case, three police officers, despite being unable to get a warrant for his arrest, woke Kaupp, a 17-year-old suspect, at 3 a.m.  They told him " 'we need to go talk' " and that they were taking him to the police station.  (*Ibid.*)  Kaupp responded, " 'okay.' " (*Ibid.*)  The officers "handcuffed him and led him shoeless and . . . in [his] boxer shorts . . . [to] a patrol car." (*Ibid.*)  The officers transported him to the scene of the crime and then to the police station.  The high court held that in this situation, a reasonable person would not feel that he or she could leave the interview and that Kaupp's response was " 'a mere submission to a claim of lawful authority.' " (*Id.* at pp. 631-632.)

Defendant's argument is unpersuasive.  Officers are not required to inform individuals of their right to refuse police requests.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 346.)  Moreover, unlike *Kaupp*, the police here did not exhibit any claim of lawful authority.  Defendant initiated the police encounter by reporting

23

his wife and child missing. The officers met defendant at the emergency room, asked to speak with him, and transported him to the station without handcuffs. From the circumstances, it is reasonable to infer that defendant wanted to accompany the officers to the station, in part, to obtain a ride since he had no other means of transportation.

At the detective bureau, the interview itself was investigatory, lasted less than an hour, was not "hostile, menacing, or accusatory," and occurred in an unlocked room. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 345; see *People v. Stansbury* (1995) 9 Cal.4th 824, 828, 832, 834 [no custodial interrogation where defendant not considered a suspect at time of interview and officers' questions were investigatory, not accusatory]; *Green v. Superior Court* (1985) 40 Cal.3d 126, 131-133, 135 [same].) Defendant knew he was not under arrest since he was told he could leave after the interview. (See *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [no custody where defendant came voluntarily to police station, and told immediately he was not under arrest].) The detectives asked about Mary's and Carley's activities that morning, defendant's activities that day and the circumstances of discovering the van. Defendant answered all of their questions, and did not confess to any involvement in the murders. After the interview, defendant, who had earlier been allowed to use a detective bureau restroom, was not arrested and was instead driven home. (See *People v. Leonard, supra*, 40 Cal.4th at p. 1401; *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404.)

Defendant contends that the detectives' manner communicated that they were in control. They said, "I'm going to ask you some questions," "sit up a bit now," and "open your eyes and look at this." However, the record shows that, in context, these statements were made in connection with the officer's efforts to determine whether defendant understood and voluntarily signed a statement allowing the police to search his house for evidence. Defendant claims that he

24

was not free to leave when he said, "I'm very sore, very tired. I'm sorry," and the detectives responded, "[W]e'll try and get this done as quickly as we can." Again, the record shows that, in context, it appears defendant was apologizing for misunderstanding a question by one of the officers, not indicating that he wanted to end the interview. Finally, defendant argues that the detectives communicated their control by repeatedly requesting him to speak up. Detective Shumway testified that they were having difficulty understanding defendant. Consequently, they asked him to speak up.

Toward the end of the interview, the officers left the room and gave defendant a break, during which he said to no one in particular, "Oooh. Don't leave me in here for 30 fucking min --, minutes. I gotta go." This was not directed to the officers. Even if these words indicated that defendant subjectively believed he was not free to go, the test is whether a reasonable person would feel free to leave. (*Yarborough v. Alvarado*, *supra*, 541 U.S. at p. 663.) When the officers returned, they stated that they were almost done and only had a few more questions before he could go home. After asking a few more questions about Mary and the day of the murders, the detectives ended the interview. Thus, there was no indication that defendant's "freedom to depart was restricted." (*Oregon v. Mathiason, supra*, 429 U.S. at p. 495.)

In examining all of the uncontradicted facts surrounding the police encounter with defendant, it is clear that a reasonable person in defendant's situation would have believed he was free to leave at any time and to terminate the interview. Accordingly, defendant was not unlawfully seized when the police transported him to the detective bureau and not in custody when he was interviewed. The trial court correctly denied defendant's motion to suppress the interview.

## 2. *Admission of Deceased Witness's Prior Consistent Statement*

Defendant argues that the trial court prejudicially erred in admitting, as prior consistent statements, Mae Ballou's testimony regarding her husband's identification of defendant as the man he saw walking by his house on the morning of the murders.

Edward "Les" Ballou died before trial. On the prosecution's motion, and with no objection from defendant, the trial court found Les unavailable and admitted his preliminary hearing testimony at trial. (Evid. Code, § 1291, subd. (a)(2).)

At the preliminary hearing, Les Ballou had testified that he lived on Nellie Street, around the corner from Duncan Avenue where the bodies of Mary and Carley were found. On April 22, 1999, the day of the murders, he was working in his front yard between 10:00 and 10:30 a.m. and said "hi" to a man who walked by. The man was walking away from Duncan Avenue. Although the man replied " 'hello,' " he was "not very nice" and seemed angry. Les identified defendant as the man he saw that morning.

After he saw defendant on April 22, Les Ballou saw a photograph of defendant in the June 3, 1999 edition of a newspaper. He testified he was "pretty sure" that defendant was the man who had walked by his house on the day of the murders. When Les saw defendant's photograph, he told his wife Mae, "That's the man I saw walking down the street."

On the prosecution's motion, and over defendant's objection, the trial court admitted the testimony of Les Ballou's wife, Mae Ballou, regarding prior consistent statements made by Les to Mae before the preliminary hearing. The trial court admitted Mae's testimony, both as substantive evidence and to support Les's credibility as a witness, pursuant to Evidence Code sections 1236, 1202, and 791.

26

At trial, Mae Ballou testified that on the day the police found the van parked around the corner with the mother and little girl inside, Les Ballou was working in the front yard. Before noon that day, Les told her that a man had passed by their house. When Les said hello, the man ignored him and walked away. Mae believed that the man's disregard of her husband hurt Les's feelings. Mae identified defendant's newspaper photograph. She stated that she was present when Les read the newspaper and saw the photograph. He told her that the man in the photograph was the same man who had passed by and did not say hello to him. When Mae asked him if he was sure, Les replied yes.

On cross-examination, Mae Ballou acknowledged that the day after the murders, the police interviewed Les and Mae and asked if they had noticed anything unusual during the previous morning or afternoon. They only replied that a man from AT&T was doing some repairs for hours that day.

Defendant claims that the trial court erred in admitting Mae Ballou's testimony as substantive proof and to support Les Ballou's credibility. The Attorney General agrees that the trial court erred in admitting Mae's testimony as hearsay evidence, under Evidence Code sections 1236 and 791, but argues that the court correctly admitted Mae's testimony to support Les Ballou's credibility, under Evidence Code sections 1202 and 791. We agree with the Attorney General.

The Attorney General concedes that Mae Ballou's hearsay testimony did not qualify as prior consistent statements under Evidence Code sections 1236 and 791 because Les Ballou did not testify at trial. Evidence Code section 1236 permits the admission of a prior statement, as hearsay evidence, if it is consistent with the witness's testimony at "the hearing" and is offered in compliance with

27

Evidence Code section 791.**13**  Similarly, Evidence Code section 791 permits the admission of a prior statement that is consistent with the witness's "testimony at the hearing" to support the credibility of the witness.  The phrase "at the hearing" refers to "the hearing at which a question under this code arises, and not some early or later hearing."  (Evid. Code, § 145.)

In *People v. Williams* (1976) 16 Cal.3d 663, the trial court found a witness unavailable at trial and admitted his preliminary hearing testimony.  We held that under Evidence Code section 1235, the trial court erred in admitting prior statements of the witness as inconsistent with his preliminary hearing testimony because declarant did not testify at trial.**14**  (*People v. Williams, supra*, 16 Cal.3d at pp. 668-669.)  In *People v. Hitchings* (1997) 59 Cal.App.4th 915, 922, the Court of Appeal extended the holding of *Williams* to Evidence Code sections 1236 and 791.  (*Hitchings*, at p. 922 [language of Evid. Code, §§ 1235 and 1236 are "virtually identical" and enacted as part of same legislative bill].)

Les Ballou not having testified at trial — the hearing at which the admissibility of his prior consistent statements arose — the prior statements were not consistent with his "testimony at the hearing" within the meaning of Evidence Code section 1236.  However, as the Attorney General asserts, the trial court properly admitted Mae Ballou's testimony to support her husband's credibility under Evidence Code sections 1202 and 791, subdivision (b).

---

**13**     Evidence Code section 1236 provides:
"Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent *with his testimony at the hearing* and is offered in compliance with Section 791."  (Italics added.)
**14**     Analogous to Evidence Code section 1236, Evidence Code section 1235 allows the admission of a witness's hearsay statements that are inconsistent with his or her testimony "at the hearing" under certain conditions.

28

Evidence Code section 1202 provides, in relevant part: "Any . . . evidence offered to attack or support the credibility of the [hearsay] declarant is admissible if it would have been admissible had the declarant been a witness as the hearing."

Evidence Code section 791 provides, in relevant part: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

The Attorney General argues that had Les Ballou testified at trial, Mae Ballou's testimony regarding Les Ballou's prior consistent statements would have been offered to support Les Ballou's credibility and would have been admissible under Evidence Code section 791, subdivision (b). On the other hand, defendant claims that the prior consistent statements cannot be admitted under Evidence Code sections 1202 and 791 because the foundational requirements of Evidence Code section 791, subdivision (b) have not been met. He argues that there was no charge that his testimony at the preliminary hearing was recently fabricated or influenced by bias or other improper motive.

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) A trial court has abused its discretion when its ruling " 'fall[s] "outside the bounds of reason." ' " (*Id.* at p. 714.) We find that the trial court did not abuse its discretion in admitting the testimony of Mae Ballou regarding her husband's prior consistent statements.

On cross-examination at the preliminary hearing, defense counsel challenged Les Ballou's credibility by questioning him about the many people

who generally walked by his house, his ability to remember defendant as opposed to other people who had walked by, and his ability to recall the specific date that the man walked by. On questioning by counsel, Les Ballou admitted that he spoke to the police a day after the murders, but did not tell them about seeing defendant. He did not tell the police about seeing defendant until June 26, 1999, when Detective Shumway came to his house and interviewed him. Les stated that he did not make a calendar notation of the date he saw defendant, but told his wife a few minutes after he saw him.

Counsel further challenged Les Ballou's credibility by questioning whether his in-court identification of defendant was based on the photograph rather than on his recollection of seeing defendant on the day of the murders. Counsel asked Ballou if the photograph in the newspaper was "seared in your memory," if he knew he would be asked to identify the person he saw in the photograph, if he knew that the person in the photograph would be the accused person in court, if defendant was the same person he saw in the photograph, and if he had spoken to the district attorney and Detective DeVinna about the case. Ballou answered affirmatively to all of counsel's questions.

During argument on the admissibility of Mae Ballou's testimony, defense counsel argued that up until that point, no prior inconsistent statements had been admitted at trial. Counsel further made an offer of proof that on the day after the murders, Les Ballou did not tell the police that he saw anything unusual. Counsel argued that Les Ballou's "lack of a statement" to the police was not inconsistent with his preliminary hearing testimony.

After the trial court's ruling allowing Mae Ballou's testimony, Mae testified and defendant then called Detective Shumway as his own witness. Detective Shumway testified that on April 23, 1999, the police asked Les and Mae Ballou if they saw anyone unfamiliar or anything out of the ordinary on April 22.

30

Les and Mae replied they had seen an AT&T repairman doing some work on the telephone line. Les did not mention seeing someone walking in front of his house the day before. Similarly, Mae did not mention that Les had told her he had seen someone unfamiliar walk by their house.

The defense attacked Les Ballou's credibility by impliedly charging that his identification of defendant at the preliminary hearing testimony had been recently fabricated after he saw defendant's photograph in the paper. It invited the jury to infer that if Les had seen defendant on the day of the murders, he would have told the police in response to their questions of whether he had seen anything unfamiliar or unusual. This broad, implicit charge of fabrication allowed the prosecutor to admit Les's prior statements that were consistent with his preliminary hearing testimony. (*People v. Collins* (2010) 49 Cal.4th 175, 216 [prior consistent statements admissible to rebut implied charge that witness's testimony was based on information in police report and coaching by others rather than on own recollection]; see *People v. Brents* (2012) 53 Cal.4th 599, 616 [broad charge that witness's entire testimony was unreliable warranted admission of prior consistent statement to rehabilitate witness].)

Finally, although the trial court improperly admitted Mae Ballou's testimony of her husband's prior statements as substantive hearsay evidence, the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Despite its inadmissibility as substantive evidence, her testimony had limited value for that purpose: (1) Mae Ballou's testimony that Les told her that he saw an unfriendly man on the morning of the murders and that the man in the photograph was the same man he saw that day was entirely duplicative of Les Ballou's testimony, which was subject to cross-examination and (2) Mae had heard these statements from Les and had no personal knowledge relating to their content. On the other hand, Mae's testimony of what Les had told her was properly admitted to support

31

his credibility. It is not reasonably probable that a result more favorable to defendant would have been reached if Mae's testimony had not been admitted as substantive evidence.

### 3. *Detective Shelton's Testimony — Alleged* Crawford *Error*

The prosecution presented evidence that the police spoke with a Sav-on employee, Jennifer Fleming, about whether defendant had called the store's pharmacy asking if Mary had picked up a prescription on the day she was killed. Defendant argues that the officer's testimony violated defendant's federal constitutional right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Because the officer did not recount what Fleming had told him, but merely testified that he had spoken to her, there was no admission of an out-of-court hearsay statement within the meaning of *Crawford*.

While Mary and Carley were still missing, defendant told Doug Burdick and Jean Black that Mary planned on running errands, including picking up a prescription at the Sav-on pharmacy. He told his brother Alan and the police that he had called Sav-on to find out if Mary had been there to pick up the prescription. Defendant said he was told that she had not.

To rebut defendant's claim, the prosecutor called six Sav-on employees who were working on the morning of April 22, 1999. Four employees (Frank Lombardo, Mercedes Brand, Juana Longoria, and Sally Swor) testified that they did not recall whether they received a telephone call from defendant asking if his wife had picked up a prescription on that day. Lombardo stated that such a telephone call would have been unusual, and one he would have remembered, because he did not recall defendant's wife ever picking up a prescription. Two other employees (Kevin Rawls and Tina Shaw) testified that they had not received

32

a telephone call from defendant on that day. The seventh employee who had worked on April 22, 1999, Jennifer Fleming, did not testify.

The prosecutor then called Detective Robert Shelton. He testified that within one and a half weeks after the murders, he spoke with all seven Sav-on employees who had worked on April 22, 1999. Shelton testified that Swor and Longoria told him they had not spoken to defendant on April 22. The prosecutor then asked Shelton if he had spoken with Tina Shaw, Kevin Rawls, Mercedes Brand, Jennifer Fleming, and Frank Lombardo (seriatim), without asking what they had said. He responded yes as to each employee, without commenting on the content of their statements.

During closing argument, the prosecutor argued, "The statements by the defendant show consciousness of guilt. There's a number of them. . . . But one that stands out, 'I called Sav-on's to check to see if Mary had picked up that prescription that she ran off to do in her errands.' [¶] Well, the police looked. They checked everyone that worked at Sav-on's. You heard the police here in court come in and testify. They knew the defendant. He was a regular customer. He probably knew them by name. He didn't call Sav-on's, because he knew she didn't pick up that prescription. Mary never left home that day alive."

Defendant contends that Detective Shelton's testimony, taken in context, implied that Fleming said she had not spoken with defendant on April 22, 1999. Defendant argues that admission of that testimony regarding Fleming's statement violated his right to confrontation under *Crawford, supra*, 541 U.S. 36. Initially, the Attorney General asserts that the claim is forfeited because defendant failed to object to Shelton's testimony about Fleming. Because this case was tried before *Crawford* overruled *Ohio v. Roberts* (1980) 448 U.S. 56, defendant's confrontation claim has not been forfeited. (*People v. Pearson* (2013) 56 Cal.4th 393, 461-462.) However, the claim lacks merit.

33

Subject to exceptions not present here, *Crawford* held that the confrontation clause bars the admission of out-of-court testimonial hearsay statements except when "the declarant is unavailable" and the defendant "had a prior opportunity to cross-examine" the declarant. (*Crawford, supra*, 541 U.S. at p. 59.) Here, there was no admission of any hearsay statements made by Fleming. Detective Shelton stated what Swor and Longoria had told him, that they had not spoken to defendant on April 22, but did not divulge the contents of five employees' statements, including Fleming's. He merely testified that he had spoken to them. Nor did Shelton's testimony imply that Fleming said she had not spoken to defendant on April 22, 1999. As with Fleming, the prosecution did not present evidence that Brand, to whom Shelton also spoke, had not received a telephone call from defendant. Brand simply stated she did not remember if she had received a telephone call from defendant on April 22. Thus, Shelton's testimony did not imply that all of the employees, including Fleming, said they had not received a telephone call from defendant. To the extent the prosecutor argued that defendant had not called the Sav-on pharmacy, defendant failed to object and could have refuted that statement by arguing the prosecution failed to establish that *no* employee working that day received a telephone call from defendant.

## B. Penalty Phase Issues

### 1. *Victim Impact Testimony*

Defendant contends that his death judgment must be reversed because the prosecution's victim impact evidence was so excessive and prejudicial that it resulted in a trial that was fundamentally unfair. His claim lacks merit.

Before trial, defendant moved to exclude victim impact testimony from family members. He argued that the case was particularly emotional given the relationship of defendant and the victims and that the jury might give such

34

testimony undue weight. The trial court denied the motion to exclude the victim impact evidence, noting that the People should not be precluded from introducing the victim impact evidence because defendant chose family members as his victims. During the penalty phase, the prosecution presented the testimony of seven of Mary's family members: her mother, three siblings, two nieces, and one nephew. The witnesses testified about their relationships with Mary, how they learned of the crimes, and the impact of those crimes on their lives.

Hazel Foley, Mary's mother, testified that she and her husband had five children. She described Mary as a happy, playful, and friendly child who played "dress up" with her siblings, played the piano, and did craft projects. Mary was a good student throughout elementary school and high school, and was a very good mother. Hazel described Carley as a "very sweet, very happy" girl. She related how she waited between 3:00 p.m., when she heard Mary and Carley were missing, to 7:00 p.m., when she learned about their death. She stated that she was close to Mary and that their murders had a "terrible" effect on her and that "it hurt every day." When shown several family photographs, Hazel identified them as depicting Mary throughout her childhood.

Sandra Zalonis, Mary's sister, testified that she was five years older than Mary and that Mary "meant the world to me." Zalonis lived in Florida with her own family, but remained close to Mary. They spoke with each other at least once every two weeks. Zalonis stated that her sister, Janet, called and told her that Mary and Carley had been murdered, and that "nothing in my life prepared me." It was difficult being far away from her family in California after the crimes and she had not "done very well." She attended grief counseling and divorced her husband. She missed "everything" about Mary and Carley. Thursdays were hard for her because that was the day of the week they were killed.

35

Janet Foley, Mary's sister, testified that she was 18 months older than Mary and that they stayed close over the years. While growing up, Janet, Mary, and Sandra shared a bedroom. Janet and Mary "did just about everything together." They had chicken pox and measles at the same time, took piano and violin lessons, and participated in Girl Scouts together. Mary was maid of honor at her wedding and was the godmother to her daughter. Janet was in the delivery room with Mary when Carley was born. Janet described Mary as a loving mother, a true friend, and a special sister. She described Carley as always smiling, happy, and sharing. Carley helped her sister Ashley check her blood-sugar levels. At Janet's request, Mary and Carley were buried together with Carley's security blanket, named Blankie Bear. The funeral was hard; the family had their suspicions about what had happened and the music defendant chose to be played was "all about him," describing a father raising a child on his own. Janet missed Mary's voice, advice, and love, and missed Carley, her "angel girl's" face, smile, and voice. Mary and Carley's murder was "devastating" to Janet's mother and father. They were raising Ashley and had to adjust their daily schedule to meet the demands of her diabetic condition.

Mary's nieces and nephew, Ryan (age 9), Kyle (age 12), and Vanessa (age 14), testified that the murders had been difficult on the entire family. They related what they missed and remembered about their aunt and cousin. Vanessa stated that when her mother told her that Mary and Carley had been killed, she felt like it was a dream.

Robert Foley, Mary's brother, testified it was difficult to deal with the fact that Mary and Carley were murdered by their husband and father. Robert stated he felt extremely guilty for failing to prevent their murders. Although his father obtained strength from caring for Ashley, it had changed his "normal life" and "retirement pattern." Robert's mother had "nothing but sadness in her eyes." For

36

all Ashley had gone through, she had been doing "extremely well," largely because his parents were "making sure that she's okay." His family missed Mary and Carley "tremendously."

" 'In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825-827, 111 S.Ct. 2597, 115 L.Ed.2d 720.)' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1326.) " ' "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " [Citation.]' [Citation.]" (*People v. Ervine* (2009) 47 Cal.4th 745, 792) "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057.)

Here, the family members' testimony properly explained the nature of their relationship with the victims, the immediate effects of the murders, and the residual and continuing impact of the murder on their lives. (*People v. Chism, supra,* 58 Cal.4th at pp. 1326-1327; cf. *People v. Stanley* (1995) 10 Cal.4th 764, 831-832 [prosecutor's victim impact argument proper where defendant murdered wife].) Moreover, the number of witnesses was not excessive. (See *People v. Nelson* (2011) 51 Cal.4th 198, 207, 219 [victim impact testimony of six family members about murder's enduring impact]; *People v. Taylor* (2010) 48 Cal.4th 574, 646 [victim impact testimony of six family members representing four generations of victim's close family].)

Defendant argues that Hazel Foley's testimony about Mary's childhood and teenage years, including her identification of photographs of Mary and the family taken during those years, was not relevant to the "circumstances of the crime."

37

Although Carley was only three years old when she was killed, he makes the same argument regarding Janet Foley's identification of photographs of Carley when she was less than a year old and when she turned two. To the contrary, "[t]he People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death." ' [Citation.] Such evidence, which typically comes from those who loved the murder victim, shows 'how they missed having [that person] in their lives.' [Citations.]" (*People v. Garcia* (2011) 52 Cal.4th 706, 751-752.) Testimony about Mary's childhood incidents or activities that she shared with her family showed her uniqueness and explained why her family continued to be affected by her death. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1274-1275; *People v. Brown* (2004) 33 Cal.4th 382, 398.) Moreover, we have upheld the admission of photographs, including childhood photographs, to illustrate victim impact testimony. (*People v. Suff* (2014) 58 Cal.4th 1013, 1076; *People v. Nelson, supra*, 51 Cal.4th at pp. 219-220.)

Here, the victim impact evidence was neither unduly prejudicial nor so inflammatory that it invited the jury to make its penalty determination on a purely irrational basis.

### 2. *Multiple-Murder Special-Circumstance Instruction and Verdict Forms*

Defendant contends that in relation to the multiple-murder special-circumstance finding, the trial court prejudicially erred in instructing the jury to render a single verdict, either of life imprisonment without possibility of parole or death, with reference to both victims, rather than instructing the jury to render a separate verdict as to each victim. He argues that the instruction and attendant verdict forms deprived him of an individual penalty determination for each murder count. We conclude that defendant has forfeited his claim by failing to object to

38

the verdict forms. Even assuming his challenges to the verdict forms and jury instructions are properly before us, they lack merit.

Here, the information properly charged and the jury found true only one multiple-murder special-circumstance allegation. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 363.) With regard to the multiple-murder special circumstance, the trial court instructed during the penalty phase as follows:

"Having found the defendant, Kim Raymond Kopatz, guilty of two counts of first degree murder, *under counts I and II* of the information, and finding the multiple murder special circumstance . . . to be true, you must now return a verdict in one of the following forms:

"We, the jury in the above-entitled action, as to defendant Kim Raymond Kopatz, fix the penalty under counts I and II of the information, as death, for the multiple murders of Mary Kopatz and Carley Kopatz.

                          "or

"We, the jury in the above-entitled action, as to defendant, Kim Raymond Kopatz, fix the penalty under counts I and II of the information, as life imprisonment without the possibility of parole, for the multiple murders of Mary Kopatz and Carley Kopatz."

The jury returned a verdict of death on the multiple-murder special-circumstance finding.

Regarding his claim the verdict forms were improper, defendant has forfeited that issue by failing to object. (*People v. Jones* (2003) 29 Cal.4th 1229, 1259 ; *People v. Bolin* (1998) 18 Cal.4th 297, 330; *People v. Crittenden* (1994) 9 Cal.4th 83, 158-159.) During the discussion on the verdict forms, the trial court asked defense counsel if he had looked at them. Counsel replied, "Those are fine." When the jury returned its finding, defendant failed to object to the multiple-murder special-circumstance verdict forms.

39

In any event, defendant has failed to show that it is improper for a court to submit a single verdict form encompassing the penalty for the murder of more than one victim. "Although it is proper to employ separate verdict forms when there is more than one murder victim (see, e.g., *People v. Sandoval* [(1992)] 4 Cal.4th 155, 197 [separate death verdict returned as to one murder victim, separate life imprisonment without possibility of parole verdict returned as to each of three other murder victims]; *People v. Beardslee* [(1991)] 53 Cal.3d 68, 117 [separate death verdict returned as to each of two murder victims]; *People v. Bittaker* [(1989)] 48 Cal.3d 1046, 1106, 1110, fn. 34 [separate death verdict as to each of five murder victims]), no authority compels the rendering of separate penalty verdicts as to each victim." (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 159 [instruction for jury to render a single penalty verdict and return the same verdict form as to both victims not error ]; see *People v. Hines* (1997) 15 Cal.4th 997, 1070-1071 [same penalty verdict form as to both victims not error].) With regard to his challenge to the jury instruction relating to the multiple-murder special circumstance finding, assuming the instructional claim is properly before us (§ 1259), we similarly find no error. Because submission of a single verdict form encompassing the penalty for the murder of more than one victim was not improper, it cannot have been legal error to instruct the jury in substantially the same language.

Moreover, defendant was not prejudiced by the multiple-murder special-circumstance instruction and attendant verdict forms. With regard to the financial-gain special circumstance, the trial court instructed the jury that having determined defendant committed each murder for financial gain, it must fix the penalty under each murder count and return a separate verdict form as to each murder victim. The jury returned true findings and separate death verdicts for each murder. Thus, contrary to defendant's claim, he was not deprived of an individual penalty

40

determination for the murders of each victim since the jury was required to reach separate penalty verdicts as to each murder count.

Nevertheless, defendant further claims that the trial court erred in instructing the jury to determine both separate penalty verdicts for each murder count (counts I and II) *and* a penalty verdict for multiple murders, allowing the jury to return three death verdicts for two victims. Defendant argues that having three penalty verdicts instead of two increased the chances the jury would return a death verdict. The Attorney General concedes that giving the above multiple-murder special-circumstance instruction was error, but one that is only technical because the death verdict for the multiple murders was effectively superfluous. Although we agree that the giving of three death penalty verdicts instead of two was error, defendant has failed to show there is a reasonable possibility the death verdict for the multiple murders prejudicially infected the entire penalty decision process.

Defendant asserts that "it must have confused the jury to be asked for three penalty verdicts when only two murders had been committed." He argues that the jury could have believed that the verdict for the multiple murders should be based on different factors than the verdicts for the two murder counts, and "mitigating factors could have been misallocated or diluted." The trial court instructed that the jury should weigh "the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the *totality* of the aggravating circumstances with the *totality* of the mitigating circumstances." Moreover, in arriving at a death verdict, "the jurors each must evaluate the evidence and then unanimously determine that the aggravating factors outweigh the mitigating factors, but there is no requirement that the jury agree upon the factors employed in reaching that decision. . . . Because there is no requirement that the jury unanimously determine which aggravating factors outweigh those in

41

mitigation, there obviously can be no requirement that the jury unanimously determine which facts *within* a single category of the factors described in section 190.3, such as factor (a), justify imposition of the death penalty." (*People v. Crittenden, supra*, 9 Cal.4th at p. 159.) Thus, as long as the jury unanimously agreed that death was the appropriate penalty, the jurors need not have uniformly relied on the same factors in reaching that decision. Defendant has failed to demonstrate that he was prejudiced by the multiple-murder special-circumstance instruction and attendant verdict forms.

### 3. CALJIC Nos. 8.85 and 8.88

The trial court instructed the jury with CALJIC Nos. 8.85 and 8.88, the standard instructions explaining the penalty determination, the nature of aggravation and mitigation, the aggravating and mitigating factors to be considered, and the weighing of those factors. Defendant argues that the instructions were constitutionally defective for reasons previously rejected by this court in other cases. He raises no basis for us to reconsider these rulings.

### a. CALJIC No. 8.85

CALJIC No. 8.85, which instructed the jury to consider "whether or not" certain mitigating factors were present, did not unconstitutionally suggest that the absence of such factors amounted to aggravation. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 228.) "Nor was the trial court 'constitutionally required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either mitigating or aggravating, depending upon the jury's appraisal of the evidence.' " (*People v. Mendoza, supra*, 52 Cal.4th at p. 1097; *People v. McKinnon* (2011) 52 Cal.4th 610, 692.)

### b. CALJIC No. 8.88

CALJIC No. 8.88 is not unconstitutional for failing to instruct that: (1) "life without parole is mandatory if mitigation outweighs aggravation" (*People v. Mendoza, supra*, 52 Cal.4th at p. 1097); (2) the jury "may return a sentence of life without the possibility of parole even in the absence of mitigating evidence" (*People v. Lindberg* (2008) 45 Cal.4th 1, 52); (3) "neither party bears the burden of persuading [the jury] of the appropriateness or inappropriateness of the death penalty" (*People v. McKinnon, supra*, 52 Cal.4th at p. 694); (4) "the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors" (*People v. Streeter* (2012) 54 Cal.4th 205, 268); and (5) "there is a presumption of life." (*Ibid.*) CALJIC No. 8.88's "so substantial" standard for comparing mitigating and aggravating circumstances and its use of the term "warranted" instead of "appropriate," does not render the instruction unconstitutional or impermissibly vague. (*People v. McKinnon, supra*, 52 Cal.4th at p. 693; *People v. Lindberg, supra*, 45 Cal.4th at p. 52.)

" ' " 'The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty. [Citations.] The death penalty statute is not unconstitutional for failing to provide the jury with instructions of the burden of proof and standard of proof for finding aggravating and mitigating circumstances in reaching a penalty determination.' " ' " (*People v. Streeter, supra*, 54 Cal.4th at p. 268.)

### 4. Challenges to the Death Penalty Law

Defendant challenges California's death penalty law for reasons previously rejected by this court in other cases. He raises no basis for us to reconsider those rulings.

California's death penalty scheme does not violate international law and norms. (*People v. McCurdy* (2014) 54 Cal.4th 1063, 1112.) "We have in the past rejected the argument that the use of capital punishment 'as regular punishment' violates international norms of humanity and decency and hence violates the Eighth and Fourteenth Amendments of the United States Constitution. We have explained: ' . . . California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies.' " (*People v. Debose* (2014) 59 Cal.4th 177, 214.)

Finally, intercase proportionality review is not constitutionally required. (*People v. Debose, supra*, 59 Cal.4th at p. 213.)

### 5. Cumulative Prejudice in Guilt and Penalty Phases

Defendant contends that the cumulative prejudicial effect of the errors in both the guilt and penalty phases mandates reversal of his conviction and sentence of death. We have rejected all, except one, of defendant's claims of error. Where we found error, we have determined defendant was not prejudiced. Thus, defendant's cumulative effect argument fails.

## III. DISPOSITION

We affirm the judgment.

**CHIN, J**.

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Kopatz

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S097414
**Date Filed:** April 30, 2015

_____

**Court:** Superior
**County:** Riverside
**Judge:** W. Charles Morgan

_____

**Counsel:**

David P. Lampkin, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David P. Lampkin
P.O. Box 2541
Camarillo, CA 93011-2541
(805) 389-4388

Andrew Mestman
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
(619) 645-2458