Filed 1/19/16  P. v. Grattan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHANE GRATTAN,<br><br>    Defendant and Appellant. | D065292<br><br><br>(Super. Ct. No. SCD239168) |

APPEAL from a judgment of the Superior Court of San Diego County,

Amalia L. Meza, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie

Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury found Shane Grattan guilty of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The trial court sentenced Grattan to an indeterminate term of 25 years to life.

On appeal, Grattan contends that the trial court erred in restricting his presentation of third party culpability evidence by excluding evidence of the third party's commission of various uncharged crimes. Grattan also contends that the trial court erred in finding a witness to be unavailable for trial and in admitting the witness's preliminary hearing testimony and statements to law enforcement officers, while excluding the unavailable witness's statement to a district attorney investigator that he did not intend to testify at trial. In addition, Grattan claims that the trial court erred in limiting his presentation of evidence related to his good character. Grattan also maintains that the record does not contain evidence from which a reasonable jury could find that the killing at issue was a murder in the first degree. Finally, Grattan contends that the cumulative error doctrine requires reversal of the judgment. We affirm the judgment.

---

1    All subsequent statutory references are to the Penal Code, unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

A.   *The People's evidence*

   1.   *Grattan and the victim*

Grattan lived in his van.  He frequently parked the van in a parking lot near a marina on Harbor Drive (Harbor Drive parking lot) throughout January 2012, including during the night and early morning hours of January 18, 2012 to January 19, 2012, when the murder was committed.

The victim, Darrin Joseph, had been using a wheelchair for several months prior to the murder.  Joseph checked into a hotel on January 4, 2012, and had paid for a room through January 11.  On January 12, Joseph did not have money to pay for a room.

   2.   *The events preceding the murder*

On the evening of January 18, at approximately 8:45 p.m., David Sommers parked his car in the Harbor Drive parking lot.  Sommers saw a wheelchair next to Grattan's van and noticed that the van doors were open.  Sommers could hear voices coming from inside the van.

At approximately 9:00 p.m. that night, another man, Robert Foes, parked his van in the Harbor Drive parking lot near Grattan's van, intending to sleep in his van that night. Foes also saw the wheelchair next to Grattan's van.  In addition, Foes saw a bicycle leaning against the front of Grattan's van.  As he was falling sleep at approximately 9:00 to 9:30 p.m., Foes heard two men shouting.  One of the men said something about

going back to get his ".45" and the other responded, "It better be loaded or I'll get my .45."

The jury also heard the preliminary hearing testimony of Charles Ketring, whom the trial court found was legally unavailable to testify at trial. As described in detail in part III.B., *post*, Ketring was sleeping in his van in the Harbor Drive parking lot on the night of the murder. At approximately 11:00 or 11:30, Ketring was awakened by an argument. Ketring looked out of his van and saw Grattan get into Grattan's van. Ketring then heard banging from inside Grattan's van. (See pt. III.B., *post*.)

### 3. *Daniel Statler's testimony*

Daniel Statler was homeless. He stayed in the marina near the Harbor Drive parking lot and used his bicycle for transportation. One evening in January 2012,[2] Statler met Grattan at the marina. Statler helped Grattan clean up Grattan's van and then spent the night in the van, before leaving the next morning.

The next evening, Statler returned to Grattan's van at about 8:00 p.m. There was another person there, a white male in his mid-50s with white or gray hair.[3] Grattan and the man told Statler that the man had just purchased Grattan's van. Grattan left, and the man told Statler that he was sorry that he had bought the van because he was under the impression that Statler wanted to buy it. The man had some jewelry that he was trying to sell and asked Statler whether he knew anyone who

---

[2]    On appeal, the People contend that this was the evening prior to the murder. Statler did not testify as to the dates on which he interacted with Grattan.

[3]    During a police interview, Statler identified Joseph as the other man he saw in the van.

4

would want to buy the jewelry. Statler told the man that he could possibly help the man sell the jewelry. Grattan returned to the van and became angry. According to Statler, Grattan thought that Statler was trying to steal his friend. Statler believed there might be a romantic relationship between Grattan and the man.[4]

Statler stated that Grattan yelled at him and told him to " 'get the fuck' " out of his van and to leave. Statler tried to calm Grattan down and said he did not want any problems. Statler got on his bicycle and left the area.

4. *The discovery of the body*

Sandra Sawler and her boyfriend, Darren Virgo, went to the marina next to the Harbor Drive parking lot on the morning of January 19 at approximately 7:30 a.m. in order to have coffee and go fishing. At approximately 7:40 a.m., as Sawler was returning from getting a sweatshirt from her truck, she saw Joseph's body in some bushes. Sawler returned to Virgo and told him that she thought she had seen a dead body. Virgo went back to the bushes with Sawler, and the two saw Joseph's body.

Sawler and Virgo saw Grattan's van parked nearby, and approached it. Sawler and Virgo saw Grattan in the rear of the van. Virgo asked Grattan, " 'Hey, do you know you're sleeping ten feet from a dead guy?' " Grattan pointed toward the bushes where Joseph's body was, and said, " 'Over there?' " Virgo responded, " 'Yeah.' " Grattan asked Virgo whether he had called the police, and Virgo told him that he had

---

[4]     Joseph's mother testified that Joseph was gay.

not.  Grattan said that he would call the police.  Grattan then asked Sawler and Virgo whether they were going to wait for the police, and they responded in the affirmative.

Sawler and Virgo walked away from the van.  Within seconds, Grattan left his van and walked out of Sawler and Virgo's view.[5]  At approximately 8:27 a.m., Virgo called the police.

### 5. *Video evidence*

Police recovered video surveillance footage from a total of twelve video cameras placed around the Harbor Drive parking lot and surrounding area from the night and early morning hours of January 18 and 19th.  Forensic video expert Grant Fredericks testified concerning the images that could be seen on the surveillance videos.

At approximately 9:18 p.m.,[6] two individuals were near Grattan's van, one of whom was on a bicycle.  The cyclist rode away and was not seen again.  The other individual got into Grattan's van.  At 1:05 a.m., an object, consistent with a human in a wheelchair, moved away from the van and then returned to the van at 1:08 a.m.

At 2:49 a.m., an individual with a blanket draped over his body, walked away from the passenger's rear side of Grattan's van and then returned to the van.  At 2:52 a.m.,

---

[5]  At trial, Sawler and Virgo both testified that after initially speaking with Grattan, they waited for a while, and then returned to his van when no police arrived at the scene. Sawler and Virgo also both testified that when they returned, Grattan again told them that he would call the police, before walking away.  However, video surveillance revealed that Sawler and Virgo interacted only once with Grattan, and that Grattan walked away within seconds of their initial encounter.

[6]  The parties stipulated that the time stamp from the videos was approximately one hour ahead of the actual time.  We refer to the actual time in the text, as estimated from the time stamps on the videos.

the same individual walked away from the passenger's side of Grattan's van to the front of the van, and bent forward near the grille area of the van. At 3:13 a.m., an individual walked away from the front of the van and around a nearby car. Approximately two minutes later, that individual pushed an empty wheelchair about 200 feet away from the van, in the parking lot. The individual then returned to the van's passenger side.

Between 3:22 a.m. and 4:09 a.m., an individual made several trips from Grattan's van toward some nearby washrooms and the bay, and then returned to the van. During a couple of these trips, the individual was carrying objects, and on one occasion, at approximately 3:41 a.m., the individual appeared to be dragging something from the van.

At 4:18 a.m., an individual walked away from Grattan's van, stopped at a garbage container and then walked out of view of the camera at 4:21 a.m. No activity occurred near the van for approximately the next 50 minutes. At approximately 5:10 a.m., an individual who appeared to be wearing the same clothing as the individual who left the van at 4:18 went to the van.[7] No further activity occurred near the van, until Sawler and Virgo approached the van at approximately 7:50 a.m.

6.      *The victim's injuries and cause of death*

Paramedics arrived at the scene and determined that the victim, later identified as Joseph, was dead. The medical examiner determined that Joseph died of blunt force trauma to his head, neck and chest. As described in part III.C., *post*, Joseph had numerous broken bones, bruises, and lacerations throughout his entire body.

---

7      Fredericks testified that the individual appeared to be wearing a "hoodie with . . . light-area fabric underneath . . . ."

7.    *Forensic evidence*

Drag marks and bloodstains demonstrated that Joseph had been dragged from the van a distance of approximately 22 feet to the bushes where his body was discovered. Police found blood and blood spatter throughout the van, as well as evidence that someone had attempted to clean the interior of the van.  A sweatshirt and a shoe found in the van contained DNA that matched both Joseph and Grattan.  Police also found Grattan's DNA in scrapings under Joseph's fingernails.  Numerous bloodstains located in the interior of the van and items in the van contained Joseph's DNA.

8.    *Grattan's arrest*

When police arrested Grattan a few weeks after the murder, he had a newspaper article in his backpack about the murder.  The article indicated that the police were looking for Grattan.

B.    *The defense*

Two character witnesses testified that they believed that Grattan was nonviolent.

The defense presented evidence that Ketring had interfered with the investigation in various ways.  (See pt. III.B.1.d., *post.*)  The defense also presented evidence concerning the People's unsuccessful efforts to ensure that Ketring would be available to testify at trial.  In addition, the defense presented photographs of the Harbor Drive parking lot in an attempt to demonstrate that Ketring would have been unable to see Grattan's van, given the locations of Ketring's van and Grattan's van on the night of the murder.

8

## III.

## DISCUSSION

A.  *The trial court did not err in excluding evidence of Statler's commission of various uncharged crimes*

Grattan claims that the trial court erred in excluding evidence of Statler's commission of various uncharged crimes, which Grattan sought to introduce in order to suggest that Statler was the perpetrator of the murder. Specifically, Grattan contends that the trial court erred in excluding the evidence pursuant to Evidence Code sections 1101, subdivision (a) and 352. We review this contention pursuant to the abuse of discretion standard of review. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review applies to any ruling by a trial court concerning the admissibility of evidence].)

Grattan also claims that the trial court's ruling excluding this evidence deprived him of his constitutional right to present a defense. We assume for purposes of this decision that the de novo standard of review applies in determining whether the court's exclusion of the evidence violated Grattan's constitutional rights. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304 [stating "independent review 'comports with this court's usual practice for review of mixed question determinations affecting constitutional rights' "].)

1.  *Factual and procedural background*

a.  *The parties' briefing on in limine motions*

Prior to trial, the defense filed a motion in limine requesting permission to present evidence and argument at trial suggesting that Statler had committed the murder. The

defense argued that evidence that Statler was in Grattan's van on the night of the murder and that an argument had occurred in Statler's presence supported the inference that he committed the murder. The defense also argued that Statler had two possible motives to kill the victim. First, the defense suggested that Statler might have murdered Joseph out of anger upon learning that Joseph had purchased Grattan's van shortly after Statler had expressed an interest in buying it. Grattan also suggested that Statler might have murdered Joseph in the course of committing a robbery after Joseph had shown Statler jewelry in the van earlier on the night of the murder.

Grattan also requested permission to present evidence that Statler had committed various crimes unrelated to the charged offense, including several batteries and numerous instances in which Statler had threatened other people, including law enforcement officers. Grattan summarized Statler's extensive criminal history and lodged police reports detailing this history.[8]

The People filed an opposition in which they argued that the defense should not be permitted to present evidence of Statler's culpability for the murder because the evidence demonstrated that Statler had left Grattan's van before the murder occurred and Statler had no "motive or reason to kill the victim." The People also argued that evidence of Statler's prior bad acts should be excluded pursuant to Evidence Code section 1101, subdivision (a). In addition, the People contended that evidence of Statler's bad acts was not admissible pursuant to Evidence Code section 1101, subdivision (b) because none of

---

[8]     In describing Statler's criminal history, the defense summarized 26 separate incidents.

10

the uncharged offenses was sufficiently similar to the charged offense. The People

further argued that any third party culpability evidence should be excluded pursuant to

Evidence Code section 352 because such evidence would produce "speculative inferences

that Mr. Statler did this brutal killing," and it would "take many weeks" to provide an

"accurate depiction of Mr. Statler's history."

        b.     *The hearing on the motion and the trial court's ruling*

The trial court held a lengthy hearing regarding whether the court should permit

the defense to introduce evidence suggesting that Statler had committed the charged

crime and evidence of Statler's commission of various bad acts unrelated to the charged

crime.

At the conclusion of the hearing, the trial court ruled that "the evidence of third-

party culpability meets the threshold of raising a reasonable doubt as to defendant's guilt

as set forth in [*Hall*], so the Court will allow the defense to present to the jury a third-

party culpability defense by questioning witnesses and presenting argument to the jury."

However, the court further ruled that the defense would not be permitted to present

evidence of Statler's commission of uncharged bad acts. The court reasoned:

> "With regard to the request to introduce specific instances of Statler's
> conduct as proof of his identity as [the] perpetrator of this offense,
> the Court will deny that request. In order for prior incidents to be
> admissible, they must share common features that are sufficiently
> distinctive so as to support the inference that the same person
> committed both acts. [¶] The defense says that the prior acts of Mr.
> Statler are extremely similar to this case and they represent a pattern
> of behavior, but the Court hasn't found a single prior incident
> committed by Mr. Statler that shares unusual and distinctive features
> with the acts of this case.

11

"What we have is a history of arrests and convictions for crimes, the most violent of which are the following: A [domestic violence] case where his girlfriend suffered a cut on the nose, abrasion on the throat and redness on the face.

"The other most violent act was in October 2011, Statler was arrested for knocking a person down and then continuing to beat him.

"And . . . the third is April 2012, Statler was arrested and charged with knocking someone to the ground and pushing his elbow into his neck.

"And the last one that the Court could find that showed evidence of violence was September 1, 2012, where Statler was arrested for punching a transient and knocking him unconscious.

"All of these prior incidents are different from what occurred in this case. [¶] In this case there is evidence that the victim was brutally beaten. There is no prior incident in Mr. Statler's background that comes close to the brutality of the injuries suffered by the victim in this case so the Court finds that the prejudicial effect of introducing each and every one of these prior acts will outweigh their probative value under [Evidence Code section] 352.

"Furthermore, the assertion that the prior acts would show Statler has a propensity for violence runs counter to Evidence Code [section] 1101, which imposes the rule that character evidence is inadmissible to prove a person's conduct on a specified occasion."

2. *Governing law*

a. *Third party culpability evidence and Evidence Code section 1101*

In *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), the California Supreme Court "disapproved the judicially created heightened standard of relevancy for third party culpability evidence, holding that it should be treated like any other evidence." (*People v. Davis* (1995) 10 Cal.4th 463, 501 (*Davis*).) The *Hall* court explained the standard for admitting defense evidence that a third party committed a crime, as follows:

12

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* at p. 833.)

In *Davis*, the Supreme Court held that third party culpability evidence is subject to the limitation on character evidence contained in Evidence Code section 1101, subdivision (a).[9] (*Davis, supra*, 10 Cal.4th at p. 501 ["*Hall* did not abrogate Evidence Code section 1101 as applied to such evidence"]; see also *People v. Farmer* (1989) 47 Cal.3d 888, 921 ["Because specific instances of past conduct were offered to prove [third party's] conduct on this occasion, the court properly excluded the information under Evidence Code section 1101"].) Evidence Code section 1101, subdivision (a) provides in relevant part, "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his

---

[9] Evidence Code section 1101, subdivision (b) provides in relevant part:

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

13

or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)

Evidence that a person has committed an uncharged bad act may be admissible for purposes of proving that person's identity as the perpetrator of a charged offense under Evidence Code section 1101, subdivision (b).  However, such evidence is admissible only when "the uncharged misconduct and the charged offense . . . share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)  " 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' "  (*Ibid.*)

b.  *A defendant's constitutional right to present a defense*

In *Nevada v. Jackson* (2013) ___ U.S. ___ [133 S.Ct. 1990], the United States Supreme Court stated that while a defendant has a right to present a complete defense at trial, state evidentiary rules do not ordinarily infringe this right:

> " '[T]he Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," ' [citation], but we have also recognized that ' "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," ' [citation].  Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  (*Id*. at p. 1992.)

Similarly the California Supreme Court has observed, "[a]lthough the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary

14

point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)

3.      *Application*

Grattan appears to suggest that evidence of Statler's uncharged acts was admissible to prove that Statler, and not Grattan, was the perpetrator of the charged offense:

> "Here, the evidence showed the brutal beating that killed Joseph was clearly done by someone who was enraged to the point of violence. Statler, who admitted to being in the van with the victim within hours of Joseph's death, was a person who regularly became so enraged. Over and over, Statler threatened to kill people. He threw chairs and other objects at people. He beat individuals around the face and attempted strangulation, and on at least one occasion continuing the beating after the victim was unconscious."

Evidence that Statler was a person who "regularly became . . . enraged," and repeatedly "threatened to kill people," is character evidence that is inadmissible pursuant to Evidence Code section 1101, subdivision (a), unless offered to prove some fact other than Statler's predisposition to commit the charged offense. Grattan fails to point to any evidence that Statler previously committed a crime so similar to the charged offense "so as to support the inference that the same person committed both acts." (*Ewoldt*, *supra*, 7 Cal.4th at p. 403.) Grattan has thus failed to demonstrate that evidence of Statler's commission of uncharged bad acts was admissible to prove Statler's identity as the murderer pursuant to Evidence Code section 1101, subdivision (b).[10] The trial court

---

[10]      In his reply brief, Grattan asserts, "If Statler were the defendant, the prosecution would undoubtedly argue that his distinctive prior acts of violence were admissible to show . . . his common plan to use violence to effect acts of robbery." To the extent Grattan intends by this argument to claim that Statler's prior bad acts were admissible in

15

therefore did not abuse its discretion in excluding evidence of Statler's commission of various uncharged bad acts pursuant to Evidence Code section 1101, subdivision (a).[11]

With respect to Grattan's constitutional claim, the trial court permitted Grattan to present other third party culpability evidence (i.e. that Statler was present in Grattan's van on the night of the murder and that he had a motive for killing the victim). The court's proper application of Evidence Code section 1101, subdivision (a) to exclude the uncharged act evidence did not violate Grattan's right to present a complete defense. (See *Nevada v. Jackson*, *supra*, 133 S.Ct. at p. 1992 [" ' "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials" ' "].)

Accordingly, we conclude that the trial court did not err in excluding evidence of specific instances of Statler's conduct in order to prove that he, and not Grattan, was the perpetrator of the murder.[12]

---

order to prove a common plan or scheme, we reject that argument. Beyond this assertion, Grattan fails to provide any analysis of the evidence of the prior acts and whether they are sufficiently similar to the charged offense to be admissible under this theory. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402 [describing the nature and degree of similarity between the uncharged and charged conduct necessary to admit evidence for purposes of proving a common plan].) Further, Grattan did not present this argument in his opening brief or provide any reason for raising it for the first time in reply. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [" ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. . . ." ' "].)

[11]    In light of our conclusion that the trial court did not err in excluding the evidence pursuant to Evidence Code section 1101, subdivision (a), we need not address Grattan's contention that the trial court erred in also excluding the evidence pursuant to Evidence Code section 352.

16

B.    *The trial court did not err in finding Ketring unavailable for trial and in admitting his preliminary hearing testimony in evidence; any error in admitting Ketring's statements to law enforcement officers and in excluding evidence that Ketring told an investigator that he did not intend to testify at trial was harmless*

Grattan claims that the trial court erred in determining that Ketring was legally unavailable for trial and in admitting his preliminary hearing testimony in evidence. Grattan also claims that the trial court erred in admitting Ketring's statements to law enforcement officers and in excluding evidence that Ketring told an investigator with the district attorney's office that he did not intend to testify at trial.

1.    *Factual and procedural background*

a.    *Pretrial proceedings*

On October 18, 2013, approximately 10 days before the start of the trial, the prosecutor informed the court that the People were having difficulty locating Ketring. The prosecutor indicated that she would likely be requesting a hearing for the purpose of demonstrating the People's due diligence in attempting to locate Ketring for trial, in order to establish the admissibility of his preliminary hearing testimony at trial.

Three days before the trial, the court held a hearing concerning whether the People had exercised due diligence in attempting to locate Ketring for trial.  District Attorney

_____

12    Grattan also appears to argue that the trial court erred in excluding evidence of Statler's prior bad acts for purposes of impeaching Statler's credibility.  However, the trial court permitted Grattan to impeach Statler with three convictions for crimes involving moral turpitude, and Grattan fails to identify any additional specific instances of conduct involving moral turpitude that the trial court erroneously precluded him from using for impeachment purposes.  (*People v. Doolin* (2009) 45 Cal.4th 390, 443 [trial courts have "broad discretion to admit acts of moral turpitude to impeach a witness's credibility"].)  Accordingly, Grattan is not entitled to reversal of the judgment on the ground that the court erroneously restricted his presentation of evidence intended to impeach Statler's credibility.

17

Investigator Jonathan Smith testified that he had seen Ketring at the preliminary hearing in August 2012 and that he had spoken with him shortly after the hearing, on a couple of occasions, for the purpose of maintaining contact with him in anticipation of trial. Investigator Smith said that Ketring had telephoned him on September 19, 2013, at approximately 11 p.m. According to Smith, Ketring appeared surprised when Smith answered the phone. During the phone call, Investigator Smith told Ketring that he wanted to serve Ketring with a subpoena to testify at trial. Ketring told Smith that it was "too late," and hung up the phone. After that call, Smith exchanged several text messages with Ketring during which Ketring reaffirmed that he did not intend to appear at the trial. Smith also stated that he knew that Ketring lived in his van, but explained that he did not know where Ketring parked his van.

A paralegal with the district attorney's office, Doemoni Eynon, stated that she had consulted several computer databases in an attempt to locate Ketring, including various law enforcement databases, vehicle and driver's license registries, and a credit reporting database. Eynon identified several post office boxes and one street address associated with Ketring. Eynon sent letters to each of the post office boxes and to the street address requesting that Ketring contact the district attorney's office. The district attorney's office received no response to any of Eynon's letters.

Mel Sosa, another investigator with the district attorney's office, testified that he began looking for Ketring approximately three to four months before the trial. Sosa stated that he was present in the prosecutor's office during a July 2013 telephone conversation between the prosecutor and Ketring during which Ketring told the

18

prosecutor that he was out of the country.  Ketring refused to provide the prosecutor with his location during the conversation.  Investigator Sosa explained that he repeatedly left telephone messages for Ketring in the weeks before the trial, but never received a response.  Sosa also listed Ketring as a subject in the "Officer Notification System," a database through which investigators can request notification in the event that a subject is contacted by law enforcement.  Sosa explained that he never received any notifications through this system regarding Ketring.  Investigator Sosa also stated that he had recently gone to an address associated with Ketring, only to find that the location was a dirt lot and there was no sign of Ketring.  Sosa also had recently gone to the location of the murder in an attempt to find Ketring or his van, but had been unsuccessful.

At the conclusion of the due diligence hearing, the trial court determined that the People had carried their burden of establishing that they had undertaken reasonable efforts to locate Ketring.  The court also ruled that the People would be permitted to offer Ketring's preliminary hearing testimony in evidence at trial.  The court permitted the parties to file briefs concerning whether the People would also be permitted to offer in evidence two statements that Ketring made to law enforcement officers near the time of the murder, as statements consistent with Ketring's preliminary hearing testimony, in the wake of the defense's impeachment of Ketring at the preliminary hearing.

The People filed a brief in which they requested permission to offer evidence that Ketring had made statements to law enforcement officers that were consistent with his preliminary hearing testimony, pursuant to Evidence Code sections 1236 and 791.  The People contended that the statements in question were admissible as prior consistent

19

statements because the defense had impeached Ketring at the preliminary hearing by asking him questions concerning whether he had called the district attorney's office during the course of the investigation and falsely represented that he was an attorney.

Grattan filed a brief opposing admission of the statements, arguing that "at most, the defense implied a general tendency to fabricate," during cross-examination of Ketring at the preliminary hearing. The defense argued further that it had not suggested during cross-examination of Ketring that he had a "specific motive" to fabricate and, therefore, the People could not demonstrate that Ketring's statements to law enforcement officers had been made before the motive to fabricate arose, as is required in order for a statement to be admissible as a prior consistent statement pursuant to Evidence Code section 791, subdivision (b).

The trial court held a hearing during which the prosecutor and defense counsel reiterated their arguments pertaining to the admissibility of Ketring's statements to law enforcement officers. After hearing counsel's arguments, the court ruled that Ketring's statements were admissible. The court reasoned that defense counsel had "broadly impeached" Ketring at the preliminary hearing concerning his alleged misrepresentations to the district attorney's office, and that Ketring's statements to law enforcement officers had been made before Ketring made the false representations.

b. *Ketring's preliminary hearing testimony*

At trial, Ketring's preliminary hearing testimony was read to the jury. Ketring stated that for several months before the murder, he had been sleeping in his van, which he had parked in the Harbor Drive parking lot. On January 18, 2012, Ketring went to

20

sleep at approximately 8:30 or 9:00 p.m. At approximately 11:00 to 11:30, Ketring was awakened by the sound of yelling. Ketring heard someone say, " '[F]uck you. I'll kick your ass. You better—better roll my shit back. You better roll it back.' " Ketring did not hear anyone respond to this yelling, which was coming from the area of Grattan's van.

Ketring looked out of his van and saw Grattan walking toward Grattan's van. Grattan got into the van through the passenger side "cargo" door and shut the door. Immediately thereafter, Ketring heard a banging sound emanating from inside the van. The banging sounds continued for about twenty minutes. Ketring then heard a tapping sound, then more "[r]andom banging."

Ketring was awakened again at approximately 5:00 to 5:30 the following morning by the sound of "[someone] . . . hitting the sheet metal of [Grattan's] van with a hammer." Approximately fifteen or twenty minutes later, Ketring heard the side doors to Grattan's van open and close. Ketring then heard the "engine cranking over and over," as if someone were attempting to start the van.

During cross-examination, defense counsel asked Ketring whether he had placed telephone calls to various individuals associated with the murder investigation and misrepresented his identity during those calls. For example, counsel asked whether Ketring had ever contacted the district attorney's office and stated that he was a family member of the victim. Ketring denied ever having done so. Defense counsel also asked whether a police sergeant had instructed Ketring not to interfere with the investigation. Ketring responded, "He had mentioned something."

c.     *Ketring's statements to law enforcement officers*

During the trial, the People played a portion of an audio recording of San Diego Police Detective Rob Newquist's interview of Ketring that was conducted a few hours after police discovered Joseph's body.  During the interview, Ketring described, in a manner consistent with his preliminary hearing testimony, having been awakened the previous night by the sound of yelling and then seeing Grattan get into Grattan's van and hearing banging sounds coming from the van.  In addition, as he testified at the preliminary hearing, Ketring told the detective that he heard more banging coming from the van the following morning at around 5:00 or 5:30 a.m.

A second police detective briefly testified that Ketring had made similar statements to him during a February 8, 2012 interview.

d.     *Evidence implicating Ketring in misrepresenting his identity in telephone calls to the district attorney's office*

The following two stipulations were read to the jury:

"[O]n February 10, 2012,[13] Olivia Colon, an employee of the San Diego County District Attorney's Office received a phone call from an individual identifying himself as Dan Miller.  The individual requested to speak with the prosecutor and believed the case against the defendant had been undercharged.  The individual indicated he knew about the murder and believed the victim had been kidnapped, tortured and raped.  The individual who identified himself as Dan Miller was calling from a phone number . . . which was assigned to Charles Ketring.

"[O]n February 10, 2012, Nancy Dodd, an investigator at the District Attorney's Office, received a telephone call from a male caller who identified himself as Dan Miller.  He was upset and would not leave

---

13     February 10, 2012 was approximately three weeks after the murder.

22

a voice mail. He said that he was the victim's brother-in-law and that the victim had been tortured, befriended [*sic*] and that the whole case started as a kidnapping."

The defense presented evidence that, in the weeks after the murder, Ketring telephoned various officials involved in the murder investigation and misrepresented his identity during these calls. The defense also presented evidence that a police detective received information that Ketring had told harbor police officials that he was immune from receiving parking violations based on his status as a witness in this case, and that the detective twice admonished Ketring not to interfere with the activities of the harbor police.

### e. *The trial court's exclusion of evidence that Ketring told an investigator that he did not intend to testify at trial*

At trial, the defense filed a motion requesting permission to present evidence to impeach Ketring's credibility. In particular, the defense stated that it wanted to present evidence that Ketring had told an investigator with the district attorney's office that he did not intend to testify at trial, as well as evidence that Ketring had not returned telephone calls or letters from the district attorney's office attempting to locate him for trial.

The People filed an opposition in which they acknowledged that evidence that the People had been unsuccessful in locating Ketring for trial was relevant, but contended that Ketring's statement to a district attorney investigator that Ketring did not intend to testify was inadmissible hearsay. The People also argued that evidence that Ketring was "unreliable" was inadmissible, because "[w]hether someone is 'unreliable' is not a character trait for [honesty] or veracity."

23

At trial, the defense called Investigator Smith to testify concerning his efforts to locate Ketring for trial. Defense counsel asked Smith, "And what did Mr. Ketring tell you about coming to testify to the trial?" At this point, the prosecutor raised a hearsay objection. The defense requested a side bar conference, which the court granted.[14] During the side bar conference, the defense explained that the testimony was "not being offered for the truth of the matter . . . it's being offered to show [Ketring] is unreliable."

The prosecutor argued that "[u]nreliable is not a character trait for honesty and truthfulness, and [Ketring's statement is] hearsay."

The court sustained the prosecutor's hearsay objection.

2.     *The trial court did not err in finding Ketring unavailable for trial and in admitting his preliminary hearing testimony in evidence*

    a.     *Governing law and standard of review*

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)" (*People v. Herrera* (2010) 49 Cal.4th 613, 620 (*Herrera*).) "Although important, the constitutional right of confrontation is not absolute. [Citation.] 'Traditionally, there has been "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . ." [Citation.]' [Citation.] Pursuant to this exception, the preliminary

_____

14     The record does not indicate that the trial court had previously addressed the defense's written motion to admit the evidence.

hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right." (*Id*. at p. 621.)

Evidence Code section 1291, subdivision (a)(2) codifies the exception and provides that "former testimony," such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if "the declarant is *unavailable* as a witness," (italics added) and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (*Ibid*.)

The *Herrera* court summarized the law governing whether a witness is *unavailable* for purposes of the federal constitutional law, as follows:

> "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial. [Citation.] The United States Supreme Court has described the good faith requirement this way: 'The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' "
> (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

The *Herrera* court explained that determining whether a witness is unavailable under California law is similar:

25

"Our Evidence Code features a similar requirement for establishing a witness's unavailability. Under [Evidence Code] section 240, subdivision (a)(5) (section 240(a)(5)), a witness is unavailable when he or she is '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citations.] In this regard, 'California law and federal constitutional requirements are the same.' " (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

"[A]ppellate courts should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally guaranteed right of confrontation at trial." (*People v. Cromer* (2001) 24 Cal.4th 889, 901.)

        b.     *Application*

As discussed above, the People presented considerable evidence concerning their efforts to locate Ketring, including making numerous telephone calls, consulting various databases, and investigating possible leads concerning his whereabouts. Further, the People's search was timely, in that Investigator Sosa began searching for Ketring several months prior to the trial. Thus, several factors relevant to the due diligence inquiry support the trial court's finding that the People exercised reasonable diligence in attempting to locate Ketring. (See *Herrera*, *supra*, 49 Cal.4th at p. 622 [listing considerations relevant to due diligence inquiry].) Further, Ketring's testimony was

26

corroborated by the testimony of other witnesses as well as by physical evidence linking Grattan to the crime.

Grattan contends that Ketring's homelessness and his "erratic and bizarre behavior in inserting himself into the investigation," foretold his likely unavailability and therefore required that the People undertake "effort[s] to prevent Ketring's disappearance" such as invoking the material witness provisions of section 1332.[15] Ketring's homelessness clearly did not constitute "good cause" to demand security for his appearance under section 1332, and Ketring's behavior in inserting himself into the investigation suggested, if anything, that he was interested in the case and would appear at future proceedings.

Grattan contends that the People could have employed various additional investigative techniques such as conducting surveillance of various post office boxes associated with Keating in an effort to locate him. However, " '[w]here the record reveals, . . . that sustained and substantial good faith efforts were undertaken, the

---

[15]  Section 1332 provides in relevant part:

"(a) [W]hen the court is satisfied, by proof on oath, that there is good cause to believe that any material witness for the prosecution or defense . . . will not appear and testify unless security is required, at any proceeding in connection with any criminal prosecution . . . the court may order the witness to enter into a written undertaking to the effect that he or she will appear and testify at the time and place ordered by the court or that he or she will forfeit an amount the court deems proper.

"(b) If the witness required to enter into an undertaking to appear and testify, either with or without sureties, refuses compliance with the order for that purpose, the court may commit the witness, if an adult, to the custody of the sheriff . . . until the witness complies or is legally discharged."

defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." ' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Accordingly, we conclude that the trial court did not err in determining that Ketring was legally unavailable for trial and in admitting his preliminary hearing testimony in evidence.

3.	*Any error that the trial court committed in admitting Ketring's statements to law enforcement officers was harmless*

   a.	*We assume that the trial court erred in admitting in evidence Ketring's statements to law enforcement officers*

We assume, for purposes of this decision, that the trial court erred in admitting Ketring's statements to law enforcement officers as prior consistent statements pursuant to Evidence Code sections 1236 and 791.  We make this assumption for the following reasons.

Evidence Code section 1236 provides, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his *testimony at the hearing* and is offered in compliance with Section 791."  (Italics added.)

Evidence Code section 1202 provides, in relevant part:  "Any . . . evidence offered to attack or support the credibility of the [hearsay] declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

Evidence Code section 791 permits the introduction of "[e]vidence of a statement previously made by a witness that is consistent with his testimony at the hearing," where

28

"[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).)

In *People v. Kopatz* (2015) 61 Cal.4th 62, 84 (*Kopatz*), the Supreme Court held that evidence of a declarant's prior consistent statements are *not* admissible at a trial pursuant to Evidence Code sections 1236 and 791 where the declarant does not testify at the trial. (Citing *People v. Hitchings* (1997) 59 Cal.App.4th 915, 922 (*Hitchings*).) The *Kopatz* court explained that the prior consistent statements of such a declarant are "not consistent with his '*testimony at the hearing*' within the meaning of Evidence Code section 1236." (*Kopatz*, *supra*, at p. 84, italics added.) The *Kopatz* court noted that prior consistent statements of an unavailable witness may be admissible pursuant to Evidence Code section 1202 to "support the credibility of the [hearsay] declarant," (*Kopatz*, *supra*, at p. 85, quoting Evid. Code, § 1202) in cases in which the foundational requirements for the introduction of the statements contained in section 791 are met.

Grattan objected to the introduction of Ketring's prior consistent statements on the ground that the defense had not made an "express or implied charge" (Evid. Code, § 791, subd. (b)) at the preliminary hearing that Ketring's testimony was "influenced by bias or other improper motive." (*Ibid*.) (See pt. III.B.1.a, *ante*.) He reiterates that objection on appeal. In addressing the admissibility of Ketring's prior consistent statements, neither

29

the People nor Grattan addressed *Kopatz*,[16] *Hitchings* or Evidence Code section 1202 in the trial court or on appeal.

We have serious doubts as to whether the defense adequately raised an objection to the admissibility of Ketring's statements to law enforcement officers on the ground that Ketring had not provided "testimony at the hearing" under Evidence Code section 1236 in either the trial court or on appeal. However, we need not consider whether Grattan forfeited this objection, nor the merits of any possible objections to the introduction of the evidence under Evidence Code section 1236 or 1202, because we assume for purposes of this decision that the trial court erred in admitting the statements and conclude, for the reasons stated below, that any such error was harmless.

b. *Standard of prejudice*

We assume further that Grattan is correct that Ketring's statements to law enforcement officers were testimonial in nature, for purposes of determining whether the assumed improper admission of the statements in evidence violated Grattan's federal constitutional right to confront the witnesses against him. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1289 [summarizing "six factors to consider in determining whether statements made in the course of police questioning" are testimonial for purposes of confrontation clause analysis].) Therefore, we must apply the standard of prejudice applicable to errors implicating federal constitutional rights (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), and consider whether the error was harmless beyond

---

16    *Kopatz* was decided after the trial in this case.

a reasonable doubt (*ibid.*). (See *People v. Vargas* (2009) 178 Cal.App.4th 647, 662 [" 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman*' "].)

c.      *Any error was harmless beyond a reasonable doubt*

In considering the potential impact of the erroneous admission of Ketring's statements to law enforcement officers, we begin by observing that the improperly admitted statements were not substantive evidence of Grattan's guilt different in kind from that which the jury otherwise heard. Rather, the erroneously admitted statements were *consistent* with Ketring's preliminary hearing testimony, which was subject to Grattan's cross-examination and which we have concluded was properly admitted at trial. (See *Kopatz, supra,* 61 Cal.4th at p. 87 [improperly admitted prior consistent statement of unavailable declarant constituted harmless error where it was "entirely duplicative of [declarant's preliminary hearing] testimony, which was subject to cross-examination"].)

Further, as Grattan argues in his brief, Ketring's prior consistent statements were not admitted to rehabilitate Ketring's credibility in the wake of cross-examination at the preliminary hearing that suggested that Ketring "recently had fabricated his story." (*People v. Gurule* (2002) 28 Cal.4th 557, 621 [describing basis for admissibility of prior consistent statements under Evidence Code sections 1236, and 791, subdivision (b)].) Rather, the defense impeached Ketring with cross-examination at the preliminary hearing that, according to Grattan, demonstrated his "bizarre behavior . . . during the course of the investigation." As Grattan contends in this brief, "Nothing about the consistency of the prior statements to law enforcement was relevant to the issue of Ketring's general

31

credibility as a witness." We agree that, in judging Ketring's credibility, the jury was unlikely to attach significant weight to the fact that Ketring had made statements to law enforcement officers that were consistent with his preliminary hearing testimony. In short, Ketring's prior consistent statements were unlikely to have had significant evidentiary value either as substantive evidence or to bolster Ketring's credibility.

Grattan claims that the error in introducing Ketring's preliminary hearing testimony and prior statements[17] was prejudicial because, apart from Statler, who the prosecutor argued was "confused," Ketring was the only person who "placed [Grattan] at the marina where the van was during the night and /or early morning when [the victim] was killed." We disagree.

Even assuming that the jury would have entirely disregarded Ketring's preliminary testimony but for the improper admission of his prior consistent statements, the People presented other compelling evidence, entirely independent of Ketring's testimony, that established Grattan's guilt. Sawler and Virgo testified that just hours after the murder, Grattan was in a van that he owned, in which the murder obviously occurred.[18] When Virgo asked Grattan whether he was aware that there was a dead body approximately 10 feet from the van, Grattan asked Virgo whether he had already

_____

[17]    Although Grattan does not distinguish between Ketring's preliminary hearing testimony and his statements to law enforcement officers in his prejudice argument, as noted in the text, we have concluded that Ketring's preliminary hearing testimony was properly admitted in evidence.
[18]    A bag found in the van contained Grattan's personal property, including a prescription for Percocet.

32

called the police. When Virgo responded that he had not, Grattan stated that he would call the police. However, instead of calling the police, Grattan fled the scene.

In addition, the People presented video surveillance evidence and forensic video expert testimony from which the jury could have found that only a single individual, other than the victim, was in the van between the time the victim was murdered and the time Sawler and Virgo saw Grattan in the van. In addition, when police arrested Grattan, he had an article in his backpack about the murder that stated that the police wanted to question him in connection with the murder. A sweatshirt found in the van had blood on it and DNA matching both Grattan and the victim. A shoe in the van had blood on it and the DNA of both Grattan and the victim. Grattan's DNA was found in scrapings from under the victim's fingernails.

Accordingly, we conclude that any error in admitting Ketring's statements to law enforcement officers was harmless beyond a reasonable doubt.

4. *Any error that the trial court committed in excluding evidence that Ketring told an investigator that he did not intend to testify at trial was harmless*

Grattan claims that the trial court erred in excluding, on hearsay grounds, Ketring's statement to Investigator Smith that he did not intend to testify at the trial. Grattan contends that Ketring's statement was admissible for a nonhearsay purpose, namely, to demonstrate Ketring's lack of reliability as a witness. We assume for purposes of this decision that the trial court erred in excluding the statement on the ground that the evidence was admissible for a nonhearsay purpose, namely that it constituted, as Grattan

33

contends, "[e]vidence . . . of Ketring's lack of reliability." However, we conclude that the exclusion of Ketring's statement was harmless under any standard of prejudice.

As the People note in their brief, the jury heard a considerable amount of evidence suggesting that Ketring was attempting to avoid testifying at trial. Investigator Smith testified that, prior to the preliminary hearing, he spoke with Ketring over the telephone and exchanged text messages, and also met with him in person. After Ketring testified at the preliminary hearing, Investigator Smith was asked to locate Ketring in order to serve him with a subpoena to testify at Grattan's trial. Smith explained that he was able to contact Ketring by telephone, but that he had been unable to serve him with a subpoena. Investigator Sosa also testified that he had been asked to locate Ketring because Ketring was a witness in the case. Investigator Sosa stated that he received information concerning an address that might be associated with Ketring, but that when he went to the address, it was a dirt lot. Sosa also stated that he had never had any contact with Ketring. From Smith's and Sosa's testimonies, the jury could reasonably infer that Ketring was attempting to avoid testifying at trial. Therefore, evidence that Ketring told Smith that he would not testify at trial was not likely to have significant probative value.[19]

In addition to the unlikelihood that the jury would have reached a significantly different impression of Ketring as a witness but for the exclusion of this statement to

---

[19] The People also contend that the error was harmless because "testimony was previously elicited that Ketring told [Investigator] Smith that he was not coming to court." This argument is unpersuasive because the testimony to which the People refer was Investigator Smith's testimony at an Evidence Code section 402 hearing *conducted outside the presence of the jury*.

Investigator Smith, the People presented compelling evidence of Grattan's guilt. (See pt. III.B.3.c., *ante*.) In light of this evidence, and the marginal probative value of the excluded evidence, any error that the trial court committed in excluding evidence that Ketring told Investigator Smith that he did not intend to testify at trial was harmless under any standard of prejudice.

C.     *The trial court did not abuse its discretion under state law or violate Grattan's constitutional right to present a defense in limiting his presentation of evidence related to his good character*

Grattan claims that the trial court erred in limiting his presentation of evidence related to his good character pursuant to Evidence Code sections 1101, and 1102, subdivision (a). We review this contention under the abuse of discretion standard of review. (See *People v. Guerra*, *supra*, 37 Cal.4th at p. 1113.)

Grattan also claims that the trial court's ruling limiting the presentation of this evidence amounted to a deprivation of his constitutional right to present a defense. We assume for purposes of this decision that the de novo standard of review applies in determining whether the court's exclusion of this evidence violated Grattan's constitutional right to present a defense. (See *People v. Seijas*, *supra*, 36 Cal.4th at p. 304.)

1.     *Governing law*

Evidence Code section 1101, subdivision (a) provides in relevant part, "*Except as provided in . . .* [*Evidence Code*] *Section*[ ] *1102 . . .* evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or

35

evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Italics added.)

Evidence Code section 1102, subdivision (a) provides, "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by [Evidence Code] Section 1101 if such evidence is:  [¶]  (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character."

"Under [Evidence Code] Section 1102, the accused in a criminal case may introduce evidence of his good character to show his innocence of the alleged crime— provided that the character or trait of character to be shown is relevant to the charge made against him."  (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1102, p. 311; see also *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, 526 [stating that "[t]he character or character trait must, of course, be relevant to the offense charged," citing Law Revision Commission comment to Evidence Code section 1102.)

As discussed in part III.A.2, *ante*, ordinarily, an application of the rules of evidence does not impermissibly violate a defendant's right to present a defense. However, the complete exclusion of evidence intended to establish a defense may impair the defendant's right to present a defense.  (See pt. III.A.2.,*ante*.)

2.      *Factual and procedural background*

Prior to trial, the defense filed a motion seeking to present the testimony of various

36

witnesses as to Grattan's "good character" including that he is "humble, helpful, and peaceful," and that he had performed "numerous good deeds." The defense argued that this evidence was admissible pursuant to Evidence Code section 1102, subdivision (a). The People filed a motion to preclude the defense from presenting character evidence that Grattan is "likable, kind, helpful, and nurturing," on the ground that the evidence was irrelevant to the charged offense and was not admissible pursuant to Evidence Code section 1102, subdivision (a).

The court held a hearing on the motions prior to trial. The prosecutor acknowledged that the defense should be permitted to present character witnesses to testify as to Grattan's reputation for nonviolence. However, the prosecutor requested that the court prohibit the defense from presenting evidence that Grattan was generous, helpful, polite and courteous. Defense counsel argued that it should be permitted to introduce evidence that Grattan was kind and nurturing. The court ruled that the defense could present evidence that Grattan was peaceful and nonviolent, but that evidence that he was kind, quiet, humble, courteous, polite, and nurturing was irrelevant and inadmissible under Evidence Code section 1102.

At trial, outside the presence of the jury, defense counsel renewed her request to be permitted to present evidence that Grattan had "the character trait for helpfulness." Counsel argued, "The People's case is that this was a tortuous, prolonged killing and the fact that an individual[ ] [is] helpful, I believe, is in opposition to the . . . ability to commit a tortuous murder."

37

The trial court responded, "Well, the fact that he was helpful is not a relevant character trait so that will not come in . . . ."

3.      *Application*

The trial court did not abuse its discretion in concluding that evidence that Grattan was humble, helpful, likeable, courteous, polite, and nurturing was irrelevant in determining whether he had committed the charged murder, since those traits do not pertain to the elements of the charged offense.  Therefore, the court did not abuse its discretion in concluding that the proffered evidence was not admissible pursuant to Evidence Code section 1102, subdivision (a).  (See *People v. Qui Mei Lee*, *supra*, 48 Cal.App.3d at p. 526 [character evidence must be relevant in determining whether defendant committed the charged crime].)  Further, because the trial court properly permitted Grattan to present evidence concerning character traits that were relevant in determining whether he had committed the charged offense, i.e., his character for peacefulness and nonviolence, the trial court did not impermissibly restrict Grattan's right to present a defense.  (See *People v. Boyette* (2002) 29 Cal.4th 381, 428 [" 'Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense' "]; *People v. Thornton* (2007) 41 Cal.4th 391, 445 ["Excluding irrelevant evidence did not deprive defendant of his right to present a defense"].)

38

Accordingly, we conclude that the trial court did not abuse its discretion under state law and did not violate Grattan's constitutional right to present a defense in limiting his presentation of evidence related to his good character.[20]

D.   *There is sufficient evidence in the record to support the jury's finding that the murder was of the first degree*

Grattan contends that the record does not contain sufficient evidence from which a reasonable jury could find that the murder was of the first degree. Specifically, Grattan claims that there is insufficient evidence to support a finding that the killer committed a willful, deliberate and premeditated murder or that the killer committed the murder by means of torture.

   1.   *Governing law and standard of review*

      a.   *Sufficiency of the evidence*

In determining the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the

---

[20]   Grattan also appears to argue that the trial court erred in limiting his presentation of character evidence pursuant to Evidence Code section 352. However, neither the parties nor the trial court referred to Evidence Code section 352 in addressing this evidence in the trial court. Thus, Grattan is not entitled to reversal on this ground.

defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

b.      *First degree murder*

Section 189 provides in relevant part:

> "All murder which is perpetrated by . . . torture, or by any other kind
> of willful, deliberate, and premeditated killing . . . is murder of the
> first degree."

c.      *Willful, deliberate and premeditated murder*

In the context of first degree murder, "[t]he word 'willful' means intentional. '[W]illfulness does not include any concept that is not contained in express malice.' " (*People v. Concha* (2010) 182 Cal.App.4th 1072, 1083.)  " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citations.]  The process of premeditation and deliberation does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the Supreme Court identified three categories of evidence that are relevant in proving premeditation and deliberation:  planning activity, motive, and the manner of killing.  " 'However, . . . "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive.  *Anderson* was simply

40

intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) For example, where there is evidence that the defendant committed a murder over a prolonged period of time, "the manner of killing alone" may "support[ ] a finding of premeditation and deliberation." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11 (*Shamblin*) [citing case law concluding that record contained sufficient evidence of premeditation and deliberation where strangulation lasted five minutes or more].)

        d.     *Murder by means of torture*

In *People v. Edwards* (2013) 57 Cal.4th 658 (*Edwards*), the Supreme Court outlined the elements of murder by means of torture:

> "Murder by torture requires 1) an act or acts causing death that involve a high degree of probability of death, 2) a causal relationship between the torturous act and death, 3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and 4) commission of the act or acts with such intent." (*Id*. at pp. 715-716.)

The *Edwards* court explained that "[t]he ' "finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death. [Citations.] The acts of torture may not be segregated into their constituent elements in order to determine whether any single act by itself caused the death; rather it is the continuum of sadistic violence that constitutes the torture." ' [Citation.] [¶] 'The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the

41

nature of the killing, and the condition of the body.' " (*Edwards*, *supra*, 57 Cal.4th at p. 716.)

2.  *Application*

The record contains evidence from which a reasonable jury could find that the killer beat a disabled victim to death over a prolonged period of time by inflicting injuries over nearly his entire body. The victim's injuries included a lacerated tongue, bruising and scraping of the penis and scrotum, multiple fractured ribs on both sides of the chest, fractured nasal bones, a fractured hyoid bone,[21] and a broken Adam's apple. The victim had bruising, contusions and lacerations over his entire body. A medical examiner testified that in his opinion, none of victim's injuries would have been immediately fatal, and that his death was not rapid. This evidence is sufficient to support a finding that the killer committed a willful, deliberate and premeditated murder. (See *Shamblin*, *supra*, 236 Cal.App.4th at p. 11 [evidence as to "the manner of killing alone" may "support[ ] a finding of premeditation and deliberation" where the evidence supports finding that killing took place over prolonged period of time].)

The same evidence also supports a finding that the murder was committed by means of torture. Medical testimony concerning the victim's injuries constituted evidence that the killer committed "acts causing death that involve a high degree of probability of death," and "a causal relationship between the torturous act and death." (*Edwards*, *supra*, 57 Cal.4th at pp. 715-716.) Moreover, evidence that the killer

---

[21]   According to a medical examiner, the hyoid bone is a "horseshoe shaped bone" located at "the base of the tongue."

perpetrated a savage beating of a disabled victim constitutes evidence from which the jury could reasonably find that the killer intended to inflict extreme pain for a sadistic purpose. (See *id*. at p. 716 ["evidence of an 'unusually forcible strangulation attempt' together with other violent acts . . . [constitutes] sufficient evidence of a premeditated intent to inflict extreme and prolonged pain"].) In particular, evidence that the killer inflicted numerous injuries to the victim's genitals constitutes evidence of a premeditated intent to inflict extreme and prolonged pain. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 [concluding that evidence was sufficient to support first degree murder by torture where defendant inflicted horrific injuries on victim including burns to "her genital region" and stating "jury may infer the required mental state for murder by torture from the condition of the victim's body"].)

Accordingly, we conclude that there is sufficient evidence in the record to support the jury's finding that the murder was of the first degree.

E.      *The cumulative error doctrine does not require reversal of the judgment*

Grattan contends that the cumulative effect of the errors that he alleges requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)

Apart from two assumed evidentiary errors that we have concluded were harmless (see pts. III.B.3. and III.B.4., *ante* ), we have rejected the remainder of Grattan's claims. We further conclude that any errors that the trial court may have committed in admitting Ketring's statements to law enforcement officers and in excluding evidence that Ketring

told an investigator that he did not intend to testify at trial, whether considered individually or together, do not require reversal. Accordingly, there is no cumulative error that requires reversal of the judgment.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

McDONALD, Acting P. J.

PRAGER, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.